556 A.2d 1153

**Quincy RIDDICK**

v.

**STATE of Maryland.**

**No. 1254, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

May 1, 1989.

**376**

José Felipé Anderson, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief) Baltimore, for appellant.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Stuart O. Simms, State's Atty. for Baltimore City) Baltimore, for appellee.

Submitted before GARRITY, ALPERT and BLOOM, JJ.

ALPERT, Judge.

These days, it would take a nearly impenetrable insulation from the facts of everyday living for one not to recognize the magnitude of the illegal drug problem in the United States. This case brings into sharp focus the friction between an individual's right to be free from unreasonable searches and seizures under the Fourth Amendment

and the State's efforts to stem the flow of illicit drugs into the community.

Quincy Riddick, appellant, in a non-jury trial was found guilty in the Circuit Court for Baltimore City of possession of heroin, possession with intent to distribute heroin, and violating section 286A of article 27.[1] The possession conviction was merged into the possession with intent to distribute conviction, and he was sentenced to two concurrent seven-year terms in the Division of Correction. This appeal follows.

Appellant presents two questions for review:

1. Did the trial court err in concluding that the police conduct, accosting the Appellant as he was leaving a train station, was a reasonable seizure?

2. Did the court err when it denied Appellant's Motion to Suppress the fruit of an illegal stop and search.

## FACTS

On April 21, 1987, three members of the Drug Enforcement Section of the Baltimore City Police Department were assigned to undercover surveillance duties at Penn Station in Baltimore City. At approximately 5:25 p.m., a south bound train from New York City arrived. Detective Christopher Rayburn, a member of the team, testified at the suppression hearing that based on his expertise in drug enforcement,[2] he was aware that New York City is a "common source city" for illegal drugs and that "Amtrak is a very popular way for drug distributors to bring narcotics to Baltimore City."

---

**1.** This section prohibits the "[b]ringing into State in excess of certain amounts" of certain controlled dangerous substances.

**2.** Detective Rayburn was a four-year member of the police force, during three of which he was involved in investigating narcotics offenses. He received formal training "in narcotics detection, street sales, method of distribution, methods of packaging, appearances," etc.

The surveillance team observed appellant exiting the train. Appellant carried only a duffle bag that appeared to be nearly empty. He walked fast through the lobby, turning his head from side to side as if looking for somebody. He appeared nervous.

Detective Rayburn approached appellant from behind, walked past him, wheeled around in front of him, and identified himself as a drug enforcement officer. Detective McVicker joined Rayburn, standing slightly behind him, and Detective Olivi stood about fifteen feet away.

Detective Rayburn asked appellant if he minded talking to them. Appellant said no. During a brief discussion, appellant stated that he was in town for a few days to visit his girlfriend. Appellant appeared to be extremely nervous during this discussion.

Detective Rayburn then asked appellant if he would mind talking with them further in an interview room. Appellant replied, "No, not at all." Rayburn led the procession back to the interview room. Appellant followed with McVicker and Olivi close behind to "sort of keep [appellant] from changing his mind." (Judge's Oral Opinion, App. 17).

Once the group reached the interview room, the detectives "asked [appellant] if he had had a problem, knew about the drug problems." Appellant denied possession of any drugs, opened his duffle bag, and pulled a sweatshirt from it. According to Rayburn, he noticed a measuring spoon in the bag with white powder caked on it. Almost simultaneously, Detective Olivi questioned appellant about a bulge in his pants, to which appellant responded that it was his "privates." Due to the size and placement of the bulge, Olivi ascertained that it was not "his private part" and grabbed it. A plastic bag containing 186.8 grams of heroin was removed from appellant's pants, and appellant was arrested.

Appellant moved to suppress the heroin and other evidence as the product of an illegal seizure. After an exten-

sive hearing on appellant's motion to suppress, the motion was denied.

■ The Fourth Amendment to the Constitution, as applied to the states through the Fourteenth Amendment protects citizens from unreasonable searches and seizures. Where an officer approaches a citizen, asks him for identification, and engages him in a brief conversation, the Fourth Amendment is not implicated. "If there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed." *Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). Under the Fourth Amendment, "a person has been 'seized' . . . only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut,* —— U.S. ——, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988); *Royer, supra,* 460 U.S. at 502, 103 S.Ct. at 1326; *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980).

■ Although such a seizure is generally equated with an arrest and its concomitant requirement of probable cause, a limited exception exists where a seizure short of an arrest is permitted if an officer possesses a reasonable, articulable suspicion of past, present, or future criminal activity. *See United States v. Brignoni–Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580–81, 45 L.Ed.2d 607 (1975); *Royer, supra,* 460 U.S. at 498, 103 S.Ct. at 1324. *Cf. Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Such police intrusion may be forceful, but it is limited in scope and time—to effectuate the purpose of the stop and only for as long as it is reasonably necessary to confirm or dispel an officer's suspicions. *See Royer, supra,* 460 U.S. at 502, 103 S.Ct. at 1326. Our focus here is whether at any point in time during the event in question did the intrusiveness of police activity exceed that which would have been "reasonable" under the facts and circumstances known to the officers at the time.

■ We first focus on whether at any point prior to appellant's arrest, a Fourth Amendment seizure had taken place. We hold that the initial interaction between appellant and the officers did not implicate the Fourth Amendment. The brevity of the contact, the non-accusatory nature of the conversation, and the lack of any force or intimidation does not give rise to a reasonable belief that one was not free to leave.[3]

Appellant contends that: "The facts of this case constitute a seizure of appellant's person similar to the one found unconstitutional in *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Apparently, he would have us believe that the situation here ripened to a seizure at a point prior to the discovery of the measuring spoon in the interview room. In *Royer*, the majority stated:

> Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment.

*Id.* at 501, 103 S.Ct. at 1326. In a previous case, *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), Mendenhall was questioned in an air-

___

**3.** *Cf. United States v. Sokolow*, —— U.S. ——, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). In *Sokolow*, respondent was preparing to leave Honolulu International Airport in a taxi when DEA agents grabbed him by the arm, moved him back to the sidewalk, asked him for his airline ticket and identification, and escorted him back to the DEA office at the airport. *Id.* at ——, 109 S.Ct. at 1582. The Supreme Court, assuming, without deciding, that respondent had been "stopped" for the purposes of the Fourth Amendment, held that reasonable suspicion was present where respondent: (1) paid for his tickets in cash, (2) could have been reasonably perceived as travelling under an alias, (3) had travelled from Honolulu to Miami (a source city for illegal drugs) and back in 48 hours, (4) checked none of his luggage, and (5) appeared nervous. *Id.* at ——, 109 S.Ct. at 1586.

port's public concourse and then led to a private room and questioned. Subsequently, she was strip-searched. Mr. Justice Stewart announced the judgment of the court and stated in pertinent part:

The question whether the respondent's consent to accompany the agents was in fact voluntary or was the product of duress or coercion, express or implied, is to be determined by the totality of all the circumstances, *Schneckloth v. Bustamonte,* 412 U.S. [218] at 227 [93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)], and is a matter which the government has the burden of proving. *Id.* at 222 [93 S.Ct. at 2045], citing *Bumper v. North Carolina,* 391 U.S. 543, 548 [88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968)].

*Id.* at 557, 100 S.Ct. at 1879. Mendenhall herself did not testify at the hearing. The government's evidence showed that the respondent was not told that she had to go to the office but was simply asked if she would accompany the others. There were neither threats nor any show of force. In the instant case, as in *Mendenhall,* appellant was not told to go to the office, but was simply asked to do so according to the testimony of the police officers, which the trial judge found to be credible. As in *Mendenhall,* there were neither threats nor any show of force. As in *Mendenhall,* appellant had been questioned only briefly before he was asked to accompany the officers. Contrasting the facts as found here with those in Royer, appellant, when asked to accompany the police to the interview room, was not told that he was suspected of transporting narcotics—a fact which in our view would tend to lessen a reasonable person's belief that he was not free to leave.

While the trial judge displayed valid concerns about the manner in which the police accompanied Riddick to the interview room, his thoughtful and comprehensive conclusion is significant and bears repeating.

Finally, I guess the umbrella for this whole thing is the totality of the circumstances. This is what made up my mind and it made up my mind very, very late in the game. Probably about the time I engaged in the colloquy with

Mr. Fili. What impresses me the most about whether or not there was consent in this particular situation starts with why the Defendant opened the bag because you know Mendenhall was kind of passive. She passed the purse over. The defendant was in control of the situation here. He rips the bag open after he is asked about this problem with drugs. If he knows about any drugs and he very defiantly takes out the shirt. I think he forgot the spoon was in there or he didn't think the police understood the spoon. I draw the inference from the fact that I heard that the Defendant was kind of pruning the shirt. He knew he had a big bulge with a lot of dope. I think he was diverting the police attention by showing them the contents of the bag. Everything he did from the time he started talking to them to the time he opened the bag were all calculated gestures to divert the police's attention from the bulge. I think that it's common practice you have a lot of money in one pocket, a holdup man comes where you are and you've got five dollars. You throw the five dollars and you say help yourself and hope they never get the larger amount of money. Oftentimes it works. I think in this particular case the Defendant didn't know how much the police knew and he was running a bluff with them. He thought the more cooperative he was, the more he—to show them he was innocent, perhaps he could walk out of that station with that large amount of drugs and it almost worked. I believe if the Defendant had showed them the bag that defiantly and there was nothing in that bag, the Defendant at that point would have laughed at the police officers and said you're a bunch of fools. As he got less nervous and more visibly relaxed and the police officers would have had a hard time doing much more than that because of knowing that they almost run the string on a non-intrusive detention that if they tried to hold him from that point on almost anything he did would violate the Fourth Amendment. They sort of had played out their bluff and their bluff was about up if the Defendant's maneuver had

worked. I think he would have gone scot-free at that point.

    .     .     .     .     .

The reason I find this is consent and not acquiescence to superior fire power is because of the active defense of the Defendant, look. Look in my bag. Here. Nothing. You know, just this shirt. And then he kind of got caught with his hands down when they saw the spoon. In making those rulings, I indicated what my findings of fact were. Defendant and defense counsel can disagree. I had to look in the testimony of Rayburn and the Defendant and try to determine what is credible. From the whole sequence of events, the totality of circumstances and the way the events transpired, what's most reasonable to me and that's why the motion to suppress shall be denied.

The trial judge found as a fact (a first-level fact, *see Borgen v. State*, 58 Md.App. 61, 472 A.2d 114 (1984), and one which is entitled to great deference), that "everything he did from the time he started talking to them to the time he opened the bag were all calculated gestures to divert the police's attention to the bulge." Implicit in that finding was that appellant always believed that he was free to leave. While the trial judge did not specifically articulate the implicit finding, he was presumed to know the law and apply it properly. *Williams v. State*, 77 Md.App. 689, 702, 551 A.2d 905 (1989), *Hebb v. State*, 31 Md.App. 493, 499, 356 A.2d 583 (1976). Thus, we hold that appellant was not seized or arrested at any point prior to the discovery of the measuring spoon in the interview room.

### The Measuring Spoon

■ Upon appellant's opening his duffel bag and pulling a sweatshirt from it, Detective Rayburn noticed in the bag a measuring spoon with white powder caked on it. At that point in time, based on his training and experience, Rayburn had probable cause to arrest the appellant. We note the findings of the trial judge on this point:

The other question that concerns me, if the officer sees the spoon in plain view, can they reach in and remove the spoon? Ultimately, Coolidge versus New Hampshire, plain view analysis. Number one, is there a prior valid intrusion? Yes. If the Defendant opened up the bag and shows the contents to the police, he at that point waves his reasonable expectation of privacy. He doesn't have an additional expectation of privacy that you can see into the bag and not sort of breached the line in the bag with your hand. If he opens, he invites people to reach in. That the seizure is inadvertent because the police didn't know what was in the bag. It wasn't immediately apparent to him that it was contraband for the reason that he talked about his expertise and what the spoon meant and the packaging meant.

Appellant placed the measuring spoon in "open view" at best or "in plain view" at worst. We make this distinction in that application of the "plain view doctrine" anticipates a prior valid intrusion. *See* Gilbert & Moylan, *Maryland Criminal Law: Practice & Procedure* § 34.6. We believe that the mere questioning of appellant was not an intrusion at all but, to the extent that it was, it was a valid one. The second element of the "plain view doctrine" is inadvertence. The trial judge found as a fact that the discovery of the spoon was inadvertent. That inadvertent sighting of the spoon justified the almost contemporaneous search of appellant.

### *The Bulge*

■ As noted earlier in this opinion, almost simultaneous with Rayburn's noticing the measuring spoon, Detective Olivi noticed a bulge in appellant's pants which he quickly discovered was a plastic bag containing heroin. On this point, the trial judge concluded:

We have the intervening fact that Detective Olivi about the same time the Defendant is opening the bag, sees the bulge. Without the presence of the spoon Detective Olivi would have been much more hesitant to try to ascertain

the nature of the bulge. In any event, it doesn't matter because the presence of the spoon with the residue gives rise to the expert opinion that the Defendant had more drugs. And that the reaching for the bulge at that point is either a seizure incident to the arrest for possession of a small amount of drugs and that reaching for the bulge may also very well under those circumstances be a justifiable Terry-type frisk for weapons. I don't have to reach that question. Once the officers saw the spoon they had probable cause.

Once again, we agree with the trial judge that once Rayburn saw the spoon, there was probable cause to arrest the appellant. Although the discovery of the heroin occurred prior to Riddick's formal arrest, under certain circumstances a search may precede the arrest. *See Rawlings v. Kentucky,* 448 U.S. 98, 111, 100 S.Ct. 2556, 2564, 65 L.Ed.2d 633 (1980). Thus, we conclude that seizure of the heroin was a legitimate search incident to the arrest. The trial judge properly denied appellant's motion to suppress the evidence.

JUDGMENTS AFFIRMED; APPELLANT TO PAY THE COSTS.