571 A.2d 1239

Quincy RIDDICK

v.

STATE of Maryland.

No. 84, Sept. Term, 1989.

Court of Appeals of Maryland.

April 11, 1990.

José Felipé Anderson, Asst. Public Defender (Alan H. Murrell, Public Defender, both on brief), Baltimore, for petitioner.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for respondent.

Argued before ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and CHASANOW, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired, Specially Assigned).

CHARLES E. ORTH, Jr., Judge, Specially Assigned.

# I

## A

The police authorities of Baltimore City became aware that "New York City is a common source city for heroin and cocaine." And they knew that "a very popular way for transporting the narcotics from New York City to Baltimore was by way of Amtrak." So the tactic was adopted of assigning police officers with expertise in the field of controlled dangerous substances to the train station at 1301

North Charles Street to meet the incoming trains from New York City. One of these squads was composed of Detectives Christopher Rayburn, Dorsey McVicker, and Glenn Olivi. The routine was for them to select a person leaving the train from New York City, approach that person, identify themselves, explain that there were problems "with persons bringing narcotics into the City of Baltimore," and ask if the person minded talking to them. According to Rayburn, the person could refuse to talk, and, absent due cause, was free to leave at any time.

### B

On 21 April 1987 Quincy Riddick, also known as Quincy Latimer, had boarded the Metroliner in New York City and disembarked in Baltimore late in the afternoon at the Charles Street train station. As he walked toward the exit, carrying a duffel bag slung from his shoulder, Rayburn, McVicker, and Olivi approached him. The result of the accosting was that Riddick was arrested, charged with unlawfully possessing heroin with an intent to distribute and unlawfully bringing heroin into Maryland, convicted at a court trial in the Circuit Court for Baltimore City, and sentenced to seven years on each conviction, the sentences to run concurrently. On direct appeal, the Court of Special Appeals affirmed the judgments. *Riddick v. State,* 79 Md.App. 375, 556 A.2d 1153 (1989). Riddick sought review by this Court by a petition for a writ of certiorari. The State filed a conditional cross-petition. We granted both petitions and ordered the case to be certified to us. The questions presented went to Riddick's right to be secure in his person, papers, and effects, against unreasonable searches and seizures guaranteed by the Fourth Amendment to the Constitution of the United States and made applicable to State prosecutions by *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The issue was preserved for appellate review by the trial judge's denial of Riddick's pretrial motion to suppress the evidence seized from him by the police.

## C

■ When the question is whether a constitutional right, such as the one here, has been violated, we make our own independent constitutional appraisal. We make the appraisal by reviewing the law and applying it to the peculiar facts of the particular case. *State v. Gee*, 298 Md. 565, 571, 471 A.2d 712, *cert. denied*, 467 U.S. 1244, 104 S.Ct. 3519, 82 L.Ed.2d 827 (1984). When the facts are in dispute, we accept them as found by the trial judge unless he is clearly erroneous in his judgment on the evidence before him. In ascertaining whether he is clearly erroneous, we give "due regard to the opportunity of the trial court to judge the credibility of the witnesses," as commanded by Md.Rule 8–131(c). When the question of the dishonor of a constitutional right arises by the denial of a motion to suppress, the relevant facts which we consider "are limited to those produced at the suppression hearing, *see Trusty v. State*, 308 Md. 658, 521 A.2d 749 (1987), which are most favorable to the State as the prevailing party on the motion." *Simpler v. State*, 318 Md. 311, 312, 568 A.2d 22 (1990).

The plenary hearing on the motion was meticulous in detail and comprehensive in scope. Although testimonial evidence was adduced from only two witnesses, Rayburn for the State and Riddick for the defense, the hearing consumed seven days and the transcript of the proceedings covered some 328 pages. The witnesses were fully probed on direct examination and on cross-examination. The arguments of counsel were thorough and backed by citation to cases relating to the issue. The rulings by the judge were carefully considered and fully explained. At one point, the judge observed that this was not going to be a "boilerplate" hearing, and indeed, it was not.

## II

## A

The incident which determined the fate of Riddick may be divided into three phases: the accosting, the retreat to an

"interview room," and the events in the interview room. The testimony of Rayburn and Riddick gave diametric versions of what occurred during each phase. The judge, as was his duty, judged the credibility of the witnesses, sifted their disparate versions, and, in the main, accepted Rayburn's version as the correct· one. Our statements of the facts from time to time are as Rayburn recounted them. And we accept the judge's findings of fact as not clearly erroneous unless otherwise noted.

## B

The officers selected Riddick to accost because, in Rayburn's words,

> of all the totality, the luggage that he had, the appearance he was nervous as he was walking, looking around the station. He was walking at a very fast pace through the station. Those things totalled together are what we saw in Mr. Riddick.

Rayburn approached him from the rear, passed him, turned and faced him. McVicker and Olivi stayed to the side. Rayburn was about a yard away, close enough so Riddick could see and hear him, but, for the officer's safety, "not directly in his face." The officers identified themselves as "police officers of Baltimore Drug Enforcement" and displayed their badges. The officers were armed but no weapon was displayed. The judge summarized Rayburn's testimony as to what happened next:

> [Rayburn] asked [Riddick] if he would mind talking to [the officers] and [Riddick] at that point continued to look around and shake. He was moving around. They asked to speak to him. He said he would. They asked him where he was coming from. He said New York. They asked him how long he was going to be here. He said a couple of days. They said why. He said he was visiting a girlfriend. [Rayburn] said [Riddick] became more nervous and began fooling with his duffel bag which the

officers focused on and it did not appear to be filled with clothes.

The judge found that the accosting of Riddick was not constitutionally offensive.

## C

The officers desired to talk further to Riddick in a place more private than the middle of the train station lobby. The judge said:

These officers having learned from ... experience asked [Riddick] if he would mind going with them to the interview room, obviously because of his nervousness on the concourse and because of their own concern. He advised no problem.

The officers conducted Riddick to the interview room.

The procedure of interviewing Riddick in a private place "bothered [the judge] a little bit," [1] but he ultimately held that Riddick went willingly.

### (1)

We are constrained to point out that a matter of the alleged seizure of Riddick's wallet was not mentioned by the judge in his rulings on the accosting and the retreat to

---

1. The judge expressed his concern "about people being taken out of the concourse to private places." He emphasized, "I wouldn't want it done to me." He warned:

 [W]hen the police officers take individuals off a concourse in a public area to an interview room, ... it's fraught with danger.

 \* \* \* \* \* \*

 The officers take a dangerous risk when they ask people to leave the concourse and go with them somewhere ... Most cases what you are going to get is a group of people who are going to seem to be consenting and the evidence is going to be clear they were giving in to the overwhelming pressure. The last place they would be taking the individuals is in the interview room in the train station because that interview room is almost like a police station.

 He declared,

 I would be fearful to accompany the police in a room like that. And I don't see how I could give an informed consent if I were taken to a room such as that.

the interview room. Riddick testified that when he was accosted, Rayburn asked him for some identification. Riddick took his wallet from his hip pocket and showed Rayburn "some identification." Rayburn said, "Give me your wallet." According to Riddick, the officer did not return it. The wallet contained Riddick's driver's license, two train ticket stubs from New York to Baltimore (one for the day of the accosting), and other personal papers. Riddick's insistence that the wallet was not returned to him was evidenced by the fact that it and the driver's license and other personal papers in it were subsequently found to be stored in a police department evidence room.

The wallet first became an issue in connection with a ticket stub evidencing that Riddick had come from New York City. Rayburn at first testified that, when Riddick was ultimately arrested, among the items the police recovered from him were "ticket stubs from New York to Baltimore on the Amtrak train." The matter of the ticket stubs and wallet came up at various times during Rayburn's testimony at the hearing. He was asked by defense counsel, "Did you ask to see his ticket in the lobby?" Rayburn replied, "We asked him where he was coming from. He stated it was New York. He was in town for a couple of days." The court stepped in. The transcript reads:

THE COURT: The specific question was did you at any time in the lobby ever ask him to produce his ticket so you could see it?

THE WITNESS: No. I don't believe so.

Q. Can you be sure about that, sir?

A. Let me refer back to my notes. I don't have it in my notes as I was asking him that.

Q. If I were to tell you that the Defendant maintains that he was asked to give you his ticket, would you say that that would be an incorrect statement on his part or you can't say one way or the other?

A. I can't say one way or the other.

Q. Is it possible then that you obtained his ticket in the lobby and held on to it as you went back into the interview room?

A. Again, I don't know.

Q. Where is his ticket now?

A. I'll refer to my notes. I believe it's in our Evidence Control Section—

Q. But you have no information recorded to state with some degree of accuracy when and under what circumstances that ticket was obtained? I'm asking.

The judge interjected:

THE COURT: The more important question is do you remember when and under what circumstances the ticket came into police custody? Was it in the lobby? In the interview room? Was it before the arrest? After the arrest? When in the sequence of events did the police come in custody of the ticket?

THE WITNESS: I'm trying to recall that, Your Honor. I don't know if he ever had a ticket because I don't have it in my property listing as him having at a ticket and if he would have, yes, we would have put that in. I can't—

THE COURT: So that your answer that it was in the Evidence Control Unit is not relevant.

THE WITNESS: Is not correct. I refreshed my memory.

THE COURT: Do you have an inventory of what was seized from him? Read into the record what was seized from him.

THE WITNESS: One silver spoon with white residue, white powder residue. One large plastic bag. Inside that was a large plastic bag with white powder and one large glassine bag with white powder. U.S. currency, $392.00 was the total amount. One wallet with personal papers.

THE COURT: Have you ever inspected his personal papers to see if one of those were a ticket?

THE WITNESS: That day we would have. We make a copy of the tickets and I don't have that either.

THE COURT: Any personal papers or xeroxes you would have them in your case folder?

THE WITNESS: If they are pertinent to the case.

THE COURT: Would a ticket be pertinent to the case?

THE WITNESS: Yes, sir, it would.

THE COURT: Do you have any xeroxes of any tickets?

THE WITNESS: No, sir, I don't.

THE COURT: Do you have a reasonable expectation that if you produced personal papers from the Evidence Control Room that no tickets would be among them?

THE WITNESS: No, sir. I wouldn't think there would be.

At the court's suggestion, defense counsel requested that Rayburn produce the personal papers taken from Riddick. The court told Rayburn to look for them and report to the court after recess for lunch.

When the hearing resumed, Rayburn had the papers. He found the wallet containing the papers in the Evidence Control Section of the Police Department. Among the papers was a train ticket stub from New York to Baltimore for the day Riddick was accosted. Rayburn was asked whether his memory was now refreshed as to whether the wallet was taken from Riddick. He replied:

No, sir. I don't recall whether that was taken from him. I don't recall if it was in his wallet and I didn't make any notation as to whether that was taken.

Defense counsel pressed on:

What about his identification: Did you ask him in the lobby for identification?

Rayburn's answer was:

I don't recall. I did not make a note of whether I asked him for identification or not.

It was ascertained from Rayburn what other papers were in the wallet. Among them was Riddick's driver's license. Defense counsel asked:

> Now do you have any clear recollection, sir, as to when in the course of events these items were taken from the Defendant?

The best Rayburn could do was to speculate:

> His wallet would have been taken after he was placed under arrest.

Even then, he added:

> Again, I don't recall if the train ticket stub was in his wallet or not.

Later when the examination of Rayburn was focused on the contents of Riddick's duffel bag, Rayburn was asked:

> And did the wallet and papers come out of the bag, if you recall?

The answer was, "I don't recall."

The judge made no factual finding as to when and how the wallet and personal papers had come into the hands of the police. He did not mention the wallet or its contents in making his rulings or in his comments when reaching his decision that there was no infringement of Riddick's constitutional rights. Riddick's averment that the police asked for identification at the time of the accosting, and that in compliance he produced his wallet, which Rayburn took and did not return, stood, to all intent and purpose, undisputed and unrefuted.

### (2)

The order of the procession in the march to the interview room was Rayburn in the lead, Riddick in the middle, and McVicker and Olivi to the rear. The judge believed that McVicker and Olivi got behind Riddick to prevent Riddick "from changing his mind" about going to the interview room. The judge explained:

[Riddick may have decided to change his mind and halfway through the trip says wait a second.] This looks a little eerie. I'm not sure I want to go.

The judge thought that

the police officers were relying on [Riddick's] initial consent which was fairly emphatic and the officers were moving probably to prevent him from changing his mind.

And, the judge added, "Somewhat to protect Officer Rayburn who was up in front with [Riddick]."

(3)

In the light of all this, the constitutionality of the accosting and the retreat to the interview room is questionable. If, at the accosting, Rayburn had indeed kept the wallet produced by Riddick in compliance with the request for identification, it may well be that there was an unreasonable seizure of his person and his property at that time. In *Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), the State "submitted that the entire encounter [similar to the accosting of Riddick] was consensual and hence Royer was not being held against his will at all." The Court posited:

We find this submission untenable. Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment.

*Id.* The officers did not indicate in any way that Riddick was free to depart. And the judge's findings regarding the placement of the officers in the procession to the interview room may have clouded the constitutional validity of that action. Under those circumstances "a reasonable person [may have] believed that he was not free to leave." *United*

*States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.) (footnote omitted), quoted in *Royer* at 502, 103 S.Ct. at 1326–27. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In any event, we have no need to decide whether there was an unreasonable seizure at the time of the accosting or at the time of the trip to the interview room, because we hold that there was certainly an unreasonable seizure of Riddick's person and property in the interview room.

### III

On our approach to the resolution of this appeal, we have assumed, arguendo, that at the time Riddick and the officers entered the interview room, the guarantee of the Fourth Amendment's search and seizure clause had not been violated.

### A

The Fourth Amendment to the Constitution of the United States, short in expression but long in reach, provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

"It is clear that prohibitions against unreasonable searches and seizures do not prohibit reasonable searches and seizures." *Givner v. State,* 210 Md. 484, 494–495, 124 A.2d 764 (1956), citing *United States v. Rabinowitz,* 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950). And, absent some action taken by enforcement authorities that can properly be classified as a "search" or a "seizure," the Fourth Amendment right does not apply. *Maryland v. Macon,* 472 U.S. 463, 468–469, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985).

A search occurs when "an expectation of privacy that society is prepared to consider reasonable is infringed." *Id.* at 469, 105 S.Ct. at 2782, quoting *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). "The mere expectation that the possibly illegal nature of an [object] will not come to the attention of the authorities ... is not one that society is prepared to recognize as reasonable." *Macon,* 472 U.S. at 469, 105 S.Ct. at 2782.

A seizure occurs when "there is some meaningful interference with an individual's possessory interests" in the property seized.

*Id.,* quoting *Jacobsen* at 113, 104 S.Ct. at 1656.

Although the interest protected by the Fourth Amendment injunction against unreasonable searches is quite different from that protected by its injunction against unreasonable seizures, ... neither the one nor the other is of inferior worth· or necessarily requires only lesser protection.

*Arizona v. Hicks,* 480 U.S. 321, 328, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) (citation omitted). The Supreme Court has not "drawn a categorical distinction between the two insofar as concerns the degree of justification needed to establish the reasonableness of police action...." *Id.*

■ When a search or seizure is not under the authority of a warrant supported by probable cause, it is per se unreasonable under the Fourth Amendment, subject to only a few exceptions. *Gamble v. State,* 318 Md. 120, 123, 567 A.2d 95 (1989), citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

## B

### (1)

"One frequently mentioned 'exception to the warrant requirement,' *Coolidge v. New Hampshire,* [403 U.S. 443, 456, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971),] is the so-called 'plain view' doctrine...." *Texas v. Brown,* 460 U.S. 730,

736, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). *Brown* summarized the concept of the "plain view" doctrine set out by a plurality of the Court in *Coolidge.* The doctrine "permits the warrantless seizure by police of private possessions where three requirements are satisfied." 460 U.S. at 736–737, 103 S.Ct. at 1540.

(1) The police officer must lawfully make an *initial intrusion* or otherwise properly be in a position from which he can view a particular area.

(2) The officer must discover incriminating evidence *inadvertently,* which is to say, he may not know in advance the location of certain evidence or contraband and intend to seize it, relying on the plain view doctrine only as a pretext.

(3) It must be *immediately apparent* to the police that the items they observe may be evidence of a crime, contraband, or otherwise subject to seizure.

*See Brown,* 460 U.S. at 736–737, 103 S.Ct. at 1540–41.[2]

█ In *State v. Wilson,* 279 Md. 189, 367 A.2d 1223 (1977), we held that the "plain view" doctrine may not be

---

**2.** In *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), Justice Rehnquist announced the judgment of the Court and delivered an opinion, in which Chief Justice Burger, Justice White, and Justice O'Connor joined. Justice Powell, with whom Justice Blackmun joined, delivered an opinion concurring in the judgment. Justice Stevens, with whom Justice Brennan and Justice Marshall joined, also delivered an opinion concurring in the judgment.

 The Rehnquist opinion pointed out, *id.* at 737, 103 S.Ct. at 1541. While the lower courts generally have applied the *Coolidge* plurality discussion of "plain view," it has never been expressly adopted by a majority of this Court.... While not a binding precedent, as the considered opinion of four Members of this Court it should obviously be the point of reference for further discussion of the issue.

*See Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

 Justice Rehnquist suggested:
 "Plain view" is perhaps better understood, ... not as an independent "exception" to the Warrant Clause, but simply as an extension of whatever the prior justification for an officer's "access to an object" may be.

*Brown* at 738–739, 103 S.Ct. at 1541.

invoked unless the police have probable cause to believe that the item in question is evidence of a crime or is contraband. *Id.* at 195, 367 A.2d 1223. In *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the Supreme Court set forth the rule that

[t]he seizure of property in plain view involves no invasion of privacy and *is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.*

*Id.* at 587, 100 S.Ct. at 1380 (emphasis added). And in *Brown,* the Court stated:

We think this statement of the rule from *Payton, supra,* requiring probable cause for seizure in the ordinary case, is consistent with the Fourth Amendment and we reaffirm it here.

460 U.S. at 742, 103 S.Ct. at 1543 (footnote omitted). Nevertheless, the opinions in *Brown* explicitly regarded the issue of probable cause with respect to the "plain view" doctrine as unresolved. *Id.* at 742 n. 7, 103 S.Ct. at 1543 n. 7 (plurality); *id.* at 746, 103 S.Ct. at 1545 (Powell, J., concurring in the judgment). It was not until *Hicks* that the Court resolved the issue. *Hicks* declared flatly, "We now hold that probable cause is required" under the "plain view" doctrine, whether for a search or a seizure. 480 U.S. at 326, 107 S.Ct. at 1153. The Court observed:

Dispensing with the need for a warrant is worlds apart from permitting a lesser standard of *cause* for the seizure than a warrant would require, i.e., the standard of probable cause.

*Id.* at 327, 107 S.Ct. at 1154 (emphasis in original).

(2)

The Supreme Court has frequently remarked that probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925), that certain items may be

contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such belief be correct or more likely true than false. A "practical, non-technical" probability that incriminating evidence is involved is all that is required. *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949).

*Brown,* 460 U.S. at 742, 103 S.Ct. at 1543.[3]

(3)

Another exception to the rule that a search or seizure which is not under the authority of a warrant supported by probable cause is, per se, unreasonable, is when the search or seizure is by consent. *Gamble v. State,* 318 Md. at 123, 567 A.2d 95.

> [W]ithout a warrant to search ... and in the absence of probable cause and exigent circumstances, the validity of the search ... depend[s] on ... consent.... [T]he State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority.

*Royer,* 460 U.S. at 497, 103 S.Ct. at 1323–24.

■ We also learn from the Supreme Court that for a consent to be voluntary, it is not necessary that it meet the standard of a waiver of a constitutional right established by *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (an intentional relinquishment or abandonment of a known right or privilege). *See Schneckloth v. Busta-monte,* 412 U.S. at 235–236, 93 S.Ct. at 2051–52. And knowledge of a right to refuse to consent is not an indis-

---

**3.** In *Arizona v. Hicks,* 480 U.S. at 327, 107 S.Ct. at 1154, the Court pointed out that it did not say that "a seizure can never be justified on less than probable cause."

We have held that it can—where, for example, the seizure is minimally intrusive and operational necessities render it the only practicable means of detecting certain types of crime.

*Id.*

pensable element of a valid consent. *Id.* at 246–248, 93 S.Ct. at 2057–59. Cooperation with the police tends to show voluntariness. *See Lewis v. State,* 285 Md. 705, 719, 404 A.2d 1073 (1979); *Combs v. State,* 237 Md. 428, 206 A.2d 718 (1965); *Anderson v. State* 237 Md. 45, 205 A.2d 281 (1964); *Dougher v. State,* 236 Md. 629, 204 A.2d 324 (1964); *Hall v. State,* 232 Md. 588, 194 A.2d 801 (1963); *Armwood v. State,* 229 Md. 565, 185 A.2d 357 (1962). Furthermore, consent motivated by the belief of the consenting party that the police will not find the object of the search tends to show voluntariness. *Logue v. State,* 282 Md. 625, 629–631, 386 A.2d 780 (1978); *Borgen v. State,* 58 Md.App. 61, 81, 472 A.2d 114, *cert. denied,* 300 Md. 483, 479 A.2d 372 (1984); *Humphrey v. State,* 39 Md.App. 484, 490, 386 A.2d 1238, *cert. denied,* 283 Md. 733 (1978).

> [A] consent to search ordinarily involves determination of a question of fact. This question is to be decided in light of the totality of all the circumstances.

*Gamble,* 318 Md. at 125, 567 A.2d 95.[4]

## IV

We now illuminate the interplay between the officers and Riddick in the interview room by shining thereon the precepts of the Fourth Amendment as interpreted by the applicable case law.

## A

The "interview room" is a part of the Amtrak office. The office is staffed by Amtrak personnel, usually no more than five. No members of the public are allowed in the office unless they have a question or a complaint, but there is no guard or other security. The door to the office is glass. There are no signs prohibiting admittance.

---

4. For a comprehensive overview of consent searches, *see* Carey, *Consent Searching and Voluntariness: An Analysis of Maryland Cases,* 19.2 U.Balt.Law Forum 27 (1989).

The interview room is about 25 feet by 15 feet. There is one door leading into the office and two windows on one wall. The windows look out on Penn Drive. The door is sometimes open and sometimes closed. When Riddick was taken there, it was open. The room is well lit by a fluorescent fixture. There is a conference-type table in the room and a telephone.

## B

As soon as the group entered the interview room, Riddick put the duffel bag he was carrying on the table in front of him. Rayburn again asked "if [Riddick] had a problem, knew about the drug problems." Riddick opened his bag, pulled out a sweatshirt, and said, "I don't have anything." Without touching the bag, Rayburn glanced in it. What occurred thereafter is gleaned from his testimony elicited at various times during his examination at the suppression hearing.

Early on in the hearing, Rayburn said that he saw a quarter gram, silver measuring spoon in the duffel bag.

It had a white powder on it, and through my training and experience I know that it is common for drug people involved in the drug world to use spoons instead of weighing [a drug] because it is less time consuming.

He explained that they call it "spooning." The spoon is used to measure the quantity of the narcotic to place in a bag for sale. The spoon came up again later in his testimony.

Mr. Riddick put the bag down. I was explaining to him the problem we were having with narcotics being brought into Baltimore City on Amtrak trains. He opened up the bag to me and said see, I don't have anything and removed the sweatshirt. That's when I saw the spoon.

Further on in his testimony, Rayburn said:

Once I observed the measuring spoon, and it had a whitish powder substance on it, I removed the spoon and that is when I placed him under arrest.

Rayburn did not recall "exactly how [the spoon] was seated in the duffel bag, whether it was upside down or whatever." There was no other powder or drugs visible inside the bag. What he saw was a whitish substance on the spoon. The transcript reads:

[DEFENSE COUNSEL]: Would it be safe to say that your initial glimpse or glance did not tell you or register with you instantaneously that that was residue; that it took fifteen seconds before the thought crystallized in your head?

A. I removed it, looked at it....

Q. You removed it?

A. Yes, sir.

Q. What do you mean?

A. It was in the bag. I removed it out of the bag.

Q. In order to examine it more closely?

A. Yes, sir.

Q. Why did you do that?

A. I saw the white powder on it. I suspected that it was drugs.

Q. Would it be safe to say that you were not sure until you took it out and looked at it closely that you reached a conclusion?

A. That based on the totality of the circumstances, with our knowledge of persons using drugs?

Q. Yes.

A. Where it was coming from and so forth?

It was adduced that about 15 seconds elapsed before Rayburn realized that the white powder on the spoon might be a drug. He was asked:

At what point was the spoon taken out of the duffel bag, during that fifteen seconds or after the fifteen seconds?

He answered: "During." The transcript continues:

Q. How long did you look at the spoon before you took it out to inspect it more closely?

A. It was in the bag. He removed the sweatshirt, I saw it, looked at it, removed it, looked at it again....

Q. Before you reached in the bag and removed the spoon to inspect it more closely, what, if anything, was said by anyone in the room, including yourself?

A. I don't recall if anything was said now.

Q. Just out of curiosity, I take it there was nothing loose in the spoon? It was just some kind of filmy residue?

A. Powdery residue. It wasn't loose on the bag and so forth. It was stuck to the spoon.

THE COURT: Was this something more or less you can take with your finger and rub out or was it caked on, something that appeared to be on there for awhile?

THE WITNESS: It appeared to be a caked on residue.

BY [DEFENSE COUNSEL]:

Q. Did you taste it?

A. No, sir.

Q. I won't go into great detail on it. Let me ask you this question. Looking at it as closely as you did, it was white?

A. It was whitish.

Q. How would you compare that with talcum, for example, talcum powder?

A. How I would compare it, I don't know. I don't understand what you are asking me. Would it be—?

Q. Would it be the same as, different from, what could you say by way of comparison between what you saw and talcum powder?

THE COURT: Just residue from talcum powder.

THE WITNESS: It's somewhat similar to talcum powder in weight.

Q. [DEFENSE COUNSEL] How about sugar?

A. Sugar is more granular type. It wasn't granular.

Q. How about powdered sugar?

A. It was similar to powdered sugar. It was white.

Q. Perhaps I have asked this. Would this in retrospect be a spoon? Do you do any cooking?

A. Yes, sir.

Q. Could you use a measuring spoon like that in cooking if you were measuring some teaspoons of sugar or something like that? Could that function in that capacity?

A. Again, I guess it could. I use spoons. My spoons are round, more like a spoon.[5]

On redirect examination, the prosecutor elicited more information about the spoon. He asked, "What was there about the appearance of this white stuff on the silver spoon that made you think it was CDS, as opposed to some innocuous substance?" Rayburn replied, "Again it was like caked onto the spoon, it was where Mr. Riddick was coming from. He seemed very nervous and so forth." The court asked, "What about the physical appearance caused you to conclude that it was Controlled Dangerous Substance and not an innocuous substance?" Rayburn said, "The white powder only." The prosecutor pursued the matter:

Q. Let me ask you this, detective. You have testified as to the method of spooning, that people who owned vials or Controlled Dangerous Substance would use to package. Are spoons ever used in any other way by drug users or sellers or people involved with illegal drugs?

A. Not that I am aware of.

Q. Did you ever learn anything about the administration of drugs into the body and how the drugs may be administered?

A. Through injections.

Q. What is the use of the spoon? What do you do to the powder?

A. They liquify them.

Q. How do they do that?

A. Through spoons and/or a bottle cap.

Q. What about the spoons?

A. They heat the bottom up.

---

5. A picture of the spoon admitted in evidence showed that it had a measuring bowl at each end, one larger than the other. The bowls were oblong, not round, and squared on the end.

Q. Do you know, based upon your training and expertise, whether a white residue would remain after this, what's called cooking procedure?

A. Occasionally, yes, it would remain.

The spoon did not show marks of burning.

Rayburn arrested Riddick after the spoon was seized and examined.

About the same time that Rayburn removed the spoon from the bag, examined it, and arrested Riddick, Olivi noticed an unusual bulge in the front of Riddick's pants. He asked Riddick about it. Riddick said that it was his "private parts." Because of the size and location of the bulge, Olivi was unconvinced by this explanation. Olivi felt the bulge. It was soft and cylindrical. It was apparent that the bulge was not caused by a handgun or a knife. Olivi reached down into Riddick's pants and removed plastic Ziplock bags containing white powder which the officers believed was heroin. On chemical analysis later on, the powder proved to be heroin, 193.05 grams in amount. This contraband was the evidence sought to be suppressed and it served as the basis of Riddick's convictions.

To recap, the sequence of events in the interview room was that Riddick put his closed duffel bag on the table. Rayburn asked him about drugs. Riddick opened the bag, pulled out a sweatshirt, and, leaving the bag wide open, flaunted the shirt. Rayburn, without moving the bag or touching it in any way, glanced in it and saw a spoon which contained a residue of white powder. Rayburn reached into the bag, removed the spoon, and examined it closely. He then arrested Riddick. Almost simultaneously to the arrest of Riddick, Olivi observed an unusual bulge in the front of Riddick's pants. Not content with Riddick's accounting of the bulge, Olivi felt it, and then removed the object causing the bulge. It was plastic bags of heroin.

### C

As we note *supra*, when we determine the application of a constitutional right such as the one here, we defer to the

trial judge with respect to his findings of facts which are disputed, if his findings are not clearly erroneous. But we do not defer to him with respect to his constitutionally based conclusions reached on those facts. Rather, we make our own constitutional appraisal.

 The judge here found that "the presence of the spoon with the residue [gave] rise to the expert opinion that [Riddick] had more drugs.... Once the officers saw the spoon they had probable cause." The judge was troubled, however, by the physical invasion of the bag by Rayburn, even though he thought that glancing into the open bag was not improper. He queried:

> [I]f the officer sees the spoon in plain view, can [he] reach in and remove the spoon?

The answer the judge made to his query was of primary significance, because the judge determined that

> [i]t wasn't immediately apparent to [Rayburn] that it was contraband for the reason that he talked about his expertise and what the spoon meant and the packaging meant.

It is clear that the judge found as a fact that there was no basis on which to determine the existence of probable cause to arrest Riddick until the spoon had been removed from the bag and examined more closely. Before that, Rayburn had no more than mere suspicion. Rayburn did not arrest Riddick upon seeing the spoon in the bag. The officer waited until he seized it and scrutinized it. Therefore, the judge found it necessary to resolve whether it was "all right to reach your hand into the bag to retrieve the spoon." To resolve the question, the judge entered into a "plain view" analysis. He found that there was a prior valid intrusion. He reasoned:

> If [Riddick] opened up the bag and shows the contents to the police, he at that point waives his reasonable expectations of privacy. He doesn't have an additional expectation of privacy that you can see into the bag and not sort of breach the line in the bag with your hand. If he opens [the bag], he invites people to reach in.

The judge went astray in holding that the mere opening of the bag by Riddick not only permitted the officers to peer into the bag but also to invade it physically and remove objects which were in it. In the circumstances existent, considered in the light of the acceptable factual findings of the judge, we believe that he was wrong.

The judge found as a fact that Riddick opened the bag and flagged the sweater as a ploy to divert the officers' attention from the bulge in his pants made by the secreted heroin. The judge thought that Riddick was motivated to engage in the ploy on two bases. One was the expectation that, by pretending to cooperate with the police, the officers would look no further than the bag in their search for contraband or evidence of illegal activity. The other basis was Riddick's belief that, by focusing the officers' attention on the bag and the sweater, they would not find the heroin on his person. Thus, the opening of the bag and exposing its contents was a scheme thoughtfully and knowingly carried out by the exercise of Riddick's free will, unfettered by coercion in any way. The opening of the bag, exposing its contents, was, therefore, voluntary and tantamount to Riddick's consent for the officers to peer into the bag.

As we trace the reasoning of the judge from his comments and explanations, we are satisfied that his finding that Riddick, in effect, "consented" to have the officers peer into the bag did not go so far as to include a physical intrusion into the bag. As we interpret the judge's findings concerning the opening of the bag, he relied on the "plain view" doctrine, not consent, to justify the seizure of the spoon. With the factual findings of the judge concerning the opening of the bag as a given, on our independent constitutional appraisal we are satisfied that Rayburn's action in glancing into the bag trenched upon no right secured by the Fourth Amendment. *See Texas v. Brown,* 460 U.S. at 739–740, 103 S.Ct. at 1541–42 (officer's shining his flashlight to illuminate the interior of a car, and bending down so he could see what was inside, did not violate the Fourth Amendment). In short, no conduct of the officers

which enabled Rayburn to observe the spoon in the bag constituted a search within the meaning of the Fourth Amendment. This satisfies the first two requirements of the "plain view" doctrine. As to the first, the initial intrusion of Rayburn into the bag, namely his merely looking into the open bag, was lawful. He was properly in a position from which he could view the inside of the bag. As to the second, Rayburn discovered the incriminating evidence, the spoon, inadvertently. He did not know in advance that the spoon was in the bag and did not intend to seize it, using the "plain view" doctrine only as a pretext.[6]

## V

So, the resolution of this appeal boils down to the third requirement of the "plain view" doctrine. The question is:

At the time Rayburn observed the spoon in the bag, was it immediately apparent to him, within the strictures of probable cause, that the spoon might be evidence of a crime, contraband, or otherwise subject to seizure.

As we have seen, the judge answered the question when he found as a fact that it was not then readily apparent to Rayburn. The judge thought, as we interpret his findings, that it was not until Rayburn removed the spoon from the bag and examined it that it became readily apparent to him that the spoon was evidence tending to show that Riddick was engaged in the illegal drug trade. This factual finding, in the face of Rayburn's testimony which the judge believed, was not clearly erroneous. But it leaves the third requirement of the "plain view" doctrine unsatisfied. The doctrine may not be applied to validate the seizure of the spoon.

On our independent constitutional appraisal, we hold that the physical invasion into the bag by Rayburn and the removal of the spoon by him was an unreasonable seizure

---

**6.** The judge suggested that Riddick forgot about the spoon being in the bag or believed that the police, in any event, would not recognize it as incriminating evidence.

proscribed by the Fourth Amendment. Inasmuch as the seizure of the spoon was unconstitutional, the spoon could not serve to justify the arrest of Riddick. Because the arrest of Riddick was illegal, the search of his person incident to the arrest and the seizure of the heroin discovered on his person also offended the Fourth Amendment.[7] The exclusionary rule enjoins the State from benefiting from evidence illegally obtained.

In *Hicks*, Justice Powell, in his dissent to the holding that the search, in comparable circumstances to those here (lack of the probable cause required by the "plain view" doctrine) violated the Fourth Amendment, asked, what the police could do. 480 U.S. at 332, 107 S.Ct. at 1156. Justice Scalia replied:

It may well be that, in such circumstances, no effective means short of a search exist.

Id. at 329, 107 S.Ct. at 1155. But Justice Scalia pointed out that

there is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all.

*Id.*

The judgment of the Court of Special Appeals affirming the judgments of the Circuit Court for Baltimore City is reversed.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED;

COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.

---

**7.** "The 'plain view' exception is intimately linked with the search-incident [to a lawful arrest] exception [to warrantless searches and seizures]." *Coolidge v. New Hampshire,* 403 U.S. 443, 482, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).