754 A.2d 1111

**Venice Una DAVIS & Jerald Lee Moss**

v.

**STATE of Maryland.**

**No. 1528, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

July 3, 2000.

Geraldine K. Sweeney, Asst. Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellants.

Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Frank Weathersbee, State's Atty. for Anne Arundel County of Annapolis, on the brief), for appellee.

Submitted before HOLLANDER, KENNEY and
THEODORE G. BLOOM (Ret'd, specially assigned), JJ.

KENNEY, Judge.

Appellants, Venice Una Davis and Jerald Lee Moss, were.
tried on a plea of not guilty, with an agreed statement of facts,
and convicted of possession of cocaine with intent to distribute.
Each was sentenced to prison for ten years, with all but five
years suspended, to be served without parole, and each was
then to be placed on probation for five years, including twen-
ty-four months' home detention as a condition of the proba-
tion.

Appellants present the following question: [1]

1. Did the hearing judge err in denying the motion to
 suppress physical evidence, and a statement derived as
 a fruit of the illegal search, where the facts he relied on
 did not support his legal conclusion that there was
 reasonable articulable suspicion for the search?

## FACTUAL BACKGROUND

According to the testimony of United States Customs In-
spector Darren Comras, at the hearing on appellants' motion
to suppress, appellants arrived at Baltimore Washington In-
ternational Airport on a nonstop flight from Montego Bay,
Jamaica, on November 1, 1998. They passed through an
immigration checkpoint where proof of citizenship is verified,
picked up their luggage, and proceeded to a primary inspec-
tion area where they were selected by Inspector Thompson
and referred to a secondary inspection area for an interview
and luggage inspection. Inspector Comras said that he
searched Davis's luggage "with negative results." While ques-

---

1. Appellants initially presented two questions, contending, "The portion
 of the sentence which provides for home detention as a condition of
 probation must be vacated as an illegal sentence." Appellants have
 filed a notice that the issue regarding the legality of home detention as a
 condition of probation has been rendered moot by a sentence modifica-
 tion entered in the trial court on October 7, 1999.

tioning her about her trip, Davis appeared nervous, shifting her weight from one foot to another and sweating. Inspector Comras then requested a female officer to conduct a pat-down search of Davis's person.

United States Customs Inspector Vonda Johnson testified that she and another female officer, Inspector Druso, took Davis into a search room to conduct a "pat-down." During the pat-down, Inspector Druso felt a "padded area" around Davis's waist and thighs. When Davis lowered her slacks, a white powdery substance, wrapped in clear plastic and held in place with thick electrical tape, was discovered. Special Agent Christopher Buzzeo advised Davis of her *Miranda* rights and took a statement from her.[2]

Appellant Jerald Moss was referred to Senior Customs Inspector Michael Miller, who searched Moss's luggage with negative results. Senior Customs Inspector Miller and Special Agent Buzzeo took Moss to a search room and did a "patdown" of him. Special Agent Buzzeo "felt something abnormal" below Moss's waist and ordered Moss to "drop his pants." When he did so, packages of cocaine were discovered taped to a pair of spandex shorts worn under his boxer shorts.

The court denied appellants' motion to suppress. We shall add other facts as necessary during the discussion.

## DISCUSSION

Appellants contend, "The hearing judge erred in denying the motion to suppress physical evidence (and a statement derived as a fruit thereof), where the facts he relied on did not support his legal conclusion that there was a reasonable articulable suspicion for the search."

 In reviewing the denial of a Maryland Rule 4–252 motion to suppress, we look only to the record of the suppression hearing. We do not consider the record of the trial.

---

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

*Trusty v. State,* 308 Md. 658, 670, 521 A.2d 749 (1987) (quoting *Jackson v. State,* 52 Md.App. 327, 332, 449 A.2d 438, n. 5, *cert. denied,* 294 Md. 652 (1982)). In considering the evidence presented at the suppression hearing, we extend great deference to the fact finding of the suppression hearing judge with respect to determining the credibility of the witnesses and to weighing and determining first-level facts. *Perkins v. State,* 83 Md.App. 341, 346, 574 A.2d 356 (1990). We accept the hearing court's findings as to disputed facts unless those findings are clearly erroneous. *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990). We then make our own independent constitutional appraisal of the facts. *See Riddick v. State,* 319 Md. at 183, 571 A.2d 1239; *Perkins,* 83 Md.App. at 346, 574 A.2d 356. *See also Munafo v. State,* 105 Md.App. 662, 669, 660 A.2d 1068 (1995).

 Appellants concede that "border searches do not require probable cause, but can be justified on a lesser showing." It is well established that "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior." *United States v. Montoya de Hernandez,* 473 U.S. 531, 538, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). "[S]earches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border...." *U.S. v. Ramsey,* 431 U.S. 606, 616, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). Routine searches of the persons and effects of persons at international borders "are not subject to *any* requirement of reasonable suspicion, probable cause, or warrant." *Montoya de Hernandez,* 473 U.S. at 537, 105 S.Ct. 3304, (emphasis added.)

In *Montoya de Hernandez,* the Supreme Court found that "the detention of a traveler at the border, beyond the scope of a routine customs search and inspection, is justified at its inception if customs agents, considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal," but

noted that it suggested "no view on what level of suspicion, if any, is required for nonroutine border searches such as strip, body cavity, or involuntary x-ray searches."[3] *Id.* at 541, 105 S.Ct. 3304. The Supreme Court has not distinguished what level of invasiveness separates routine from nonroutine searches, but in *United States v. Braks,* 842 F.2d 509, 512 (1st Cir.1988), the First Circuit Court of Appeals has set forth the following factors for consideration in analyzing the invasiveness of a border search: (1) whether the search results in the exposure of intimate body parts or requires the suspect to disrobe; (2) whether physical contact between Customs officials and the suspect occurs during the search; (3) whether force is used to effect the search; (4) whether the type of search exposes the suspect to pain or danger; (5) the overall manner in which the search is conducted; and (6) whether the suspect's reasonable expectations of privacy, if any, are abrogated by the search. Only strip searches and body cavity searches consistently have been considered non-routine.[4] *See Braks,* 842 F.2d 509 (lifting up of skirt by defendant in private room revealing bulge of drugs in girdle was part of routine border search and did not necessarily require any degree of

---

3. Since *Montoya de Hernandez,* other courts have held that nonroutine searches require a reasonable suspicion. *See U.S. v. Robles,* 45 F.3d 1, 5 (1st Cir.), *cert. denied,* 514 U.S. 1043, 115 S.Ct. 1416, 131 L.Ed.2d 300 (1995); *U.S. v. Gonzalez–Rincon,* 36 F.3d 859 (9th Cir., 1994), *cert. denied,* 514 U.S. 1008, 115 S.Ct. 1323, 131 L.Ed.2d 203 (1995); *U.S. v. Johnson,* 991 F.2d 1287, 1291 (7th Cir.1993); *U.S. v. Cardenas,* 9 F.3d 1139, fn. 3 (5th Cir.1993), *cert. denied,* 511 U.S. 1134, 114 S.Ct. 2150, 128 L.Ed.2d 876 (1994); ; *U.S. v. Ezeiruaku,* 936 F.2d 136, 140 (3rd Cir.1991); *U.S. v. Oyekan,* 786 F.2d 832, 837 (8th Cir.1986).

4. BLACKS LAW DICTIONARY (7th Ed.1999) defines "strip search" as "a search of a person conducted after that person's clothes have been removed, the purpose usually being to find any contraband the person might be hiding." " 'A strip search generally refers to an inspection of a naked individual, without any scrutiny of his body cavities. A visual body cavity search extends to a visual inspection of the anal and genital areas.' *Commonwealth v. Thomas,* 429 Mass. 403, 708 N.E.2d 669, 672 n. 4 (1999). A 'manual body cavity search' includes some degree of touching or probing of body cavities. *Cookish v. Powell,* 945 F.2d 441, 444–45 n. 5 (1st Cir.1991)." *Hughes v. Com.,* 31 Va.App. 447, 524 S.E.2d 155 (2000).

suspicion); *U.S. v. Ramos–Saenz,* 36 F.3d 59 (9 th Cir. 1994)(search of shoes and baggage immediately after defendant cleared customs constituted routine search).

■ In this case, appellants were searched after arriving at Baltimore–Washington International Airport on a nonstop flight from Jamaica. After an interview and a search of their luggage, appellants were taken to separate rooms to conduct a pat-down. Pat-downs have been held to be routine searches, not requiring reasonable suspicion when conducted at the border. *See U.S. v. Beras,* 183 F.3d 22, 26 (1 st Cir.1999); *U.S. v. Carreon,* 872 F.2d 1436, 1442 (10 th Cir.1989); *U.S. v. Charleus,* 871 F.2d 265, 267–268 (2 nd Cir.1989); *Braks,* 842 F.2d at 513; *U.S. v. Shepard,* 930 F.Supp. 1189, 1195 (S.D.Ohio 1996); *Safford v. State,* 240 Ga.App. 80, 522 S.E.2d 565, 567 (1999); *But see U.S. v. Vance,* 62 F.3d 1152, 1156 (9 th Cir.1995)(pat-down search at border requires "minimal suspicion"). Thus, we conclude that the pat-down searches of appellants constituted routine searches and did not require reasonable suspicion.

■ It was only after the inspectors found a "padded area" or "something abnormal" during the routine pat-down that appellants were asked to lower their pants and cocaine was discovered taped to their body or underwear. Even if we were to find that the requests to partially disrobe went beyond a routine border search, which we do not, the extensions of the pat-down searches were clearly supported by reasonable suspicion, i.e., "a particularized and objective basis for suspecting a particular person" of smuggling contraband. *Montoya de Hernandez,* 473 U.S. at 541, 105 S.Ct. 3304. Here, the feeling of a "padded area" or "something abnormal" constituted reasonable suspicion to expand the search. *See U.S. v. Lamela,* 942 F.2d 100, 102 (1 st Cir.1991)(once the pat-down search disclosed the girdle around male defendant's waist, there was reasonable suspicion to support the more intrusive requirement that defendant remove his trousers).

Moreover, even if reasonable suspicion was necessary to justify the searches in this case, we would hold that it existed.

The agents testified that both appellants were nervous and giving information that was inconsistent with either their prior statements or with facts known to the customs officials. Davis, who said that she was a chef at a local restaurant, possessed a welfare card, but no credit card or driver's license. She claimed Jamaican customs officials always take lodging receipts when foreigners leave Jamaica, an assertion Inspector Comras knew was not true. Her statement that she had gone to Jamaica to scout locations for a wedding was suspicious because she had no resort or wedding literature in her possession. She also had a birth certificate that Inspector Thompson believed to be altered. Moss had no driver's license, which Senior Customs Inspector Miller thought was strange for a young man his age. In addition, both appellants were wearing baggy clothes, which Senior Customs Inspector Miller testified, based upon his experience as a customs official, was the type of clothing popular with people carrying drugs on their bodies.[5]

Under the circumstances, we perceive no error.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**

---

5. We note that many travelers other than drug smugglers wear "baggy clothing," whether for comfort or to make a fashion statement. The wearing of baggy clothing may properly be considered in conjunction with other factors in formulating reasonable suspicion by a reasonable and cautious police officer guided by experience and training. *See Lamela,* at 102. We express no opinion as to whether the wearing of baggy clothing in itself would constitute the basis for a reasonable suspicion.