762 A.2d 609

**Kevin Darnyl BILLUPS**

v.

**STATE of Maryland.**

**Nos. 1887, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Nov. 16, 2000.

346

Michael R. Malloy, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Shannon E. Avery, Asst. Atty. General (J. Joseph Curran, Jr., Atty. General and Patricia Jessamy, State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Argued before HOLLANDER, SONNER and KRAUSER, JJ.

KRAUSER, Judge.

Appellant, Kevin Darnyl Billups, was convicted by a jury in the Circuit Court for Baltimore City of second degree murder, robbery with a deadly weapon, second degree assault, and three counts of use of a handgun in a crime of violence. He was subsequently sentenced to a total of fifty years' imprisonment. This appeal followed.

Appellant presents for our review the following issues, which have been reworded and reordered for the purposes of discussion:

I. Whether the trial court erred in denying appellant's motion to suppress the statement he gave police.

II. Whether the trial court erred in admitting into evidence statements of the murder victim under the "excited utterance" exception to the rule against hearsay.

III. Whether the trial court erred in imposing separate sentences for use of a handgun in a murder and use of a handgun in a robbery of the same victim.

IV. Whether the jury could lawfully convict appellant of use of a handgun in a felony or crime of violence based on his second degree assault conviction.[1]

V. Whether the evidence was legally sufficient to sustain appellant's convictions.

For the reasons that follow, we shall vacate the judgment of the trial court on the ground that it erred in not suppressing appellant's statement to police and shall remand this case for further proceedings. Because we are vacating appellant's conviction on that ground, we need not address appellant's contention that the police improperly induced him to make that statement. As to appellant's contention that the evidence was insufficient to support his convictions (Issue V), we note that this claim is manifestly without merit and therefore does not warrant extended consideration. Suffice it to say that appellant's statements to police and to a fellow prisoner and his identification by the murder victim and an eyewitness to the shooting provided sufficient evidence to sustain his convictions. Finally, because this matter may be retried, we shall address such issues as remain and are properly before us for the guidance of the trial court.

## FACTS

On February 16, 1998, appellant and another individual allegedly entered the apartment of Cecil Barrett and, while there, robbed and murdered Barrett and assaulted Woodrow Cassell. Barrett was a neighbor of appellant's and purportedly sold drugs from his apartment. Cassell worked for Barrett.[2]

On that day, Barrett, responding to a knock on his front door, looked through the door's peephole and said, "Come on in, Steve." When Barrett opened the door, "Steve" and another man, who was carrying a gun, grabbed him and pulled him into the hallway. Then, pushing Barrett back into the

---

1. Counsel for appellant withdrew this issue from our consideration at oral argument.

2. In his testimony, Cassell refers to Barrett as "Paul Smith," which was the name that Barrett used with Cassell.

apartment, the two men entered. One of them ordered Cassell to lie down on the kitchen floor. Both men then forced Barrett into a back room of the apartment, where a struggle ensued. Four gunshots rang out, and one of the intruders ran out of the apartment. The other followed, carrying a gun, and shouted, "What about him," referring to Cassell. The fleeing intruder responded, "Kill him too." The gunman fired a shot at Cassell, and then he too fled.

Moments later, Barrett emerged from the back room and, despite a gunshot wound to his abdomen, ran out of the apartment in pursuit of his assailants. Outside, he entered a car and instructed its driver to take him to the hospital. Upon arriving at the hospital, Barrett collapsed in front of the emergency room door.

Officer Allen Dorsey, who was in the emergency room on an unrelated matter, approached Barrett and asked him who had shot him. Barrett replied, "Kevin," which he repeated when Officer Dorsey asked the question a second time. Dorsey then asked where the shooting had occurred. Barrett responded, "In the apartment." A few moments later, in a hospital examining room, Barrett stated to Agent Richard Hardick and, shortly after that, to Detective Ronald Copeland, "Kevin did it," and provided both officers with details about the incident and Kevin's identity. A few hours later, Barrett died of his wounds.

Three or four days later, Cassell identified appellant in a photographic array as the intruder who said "Kill him too." Appellant was arrested on February 20, 1997. In the early morning hours of February 21, 1997, appellant gave a statement to police. He admitted that, at the time of the murder and robbery, he was at Barrett's apartment to buy marijuana, but denied any involvement in the crimes. At Central Booking, however, he confided to a fellow prisoner, Bart Bowles, that he had in fact robbed and shot Barrett.

Prior to trial, appellant moved to suppress the statement he gave police and to exclude the statements made by Barrett to

police officers shortly before his death. After a hearing, both motions were denied.

## I

Appellant contends that the trial court erred in denying his motion to suppress the statement he gave police. He argues that the statement in question was taken after he had requested an attorney by writing "no" on the waiver of counsel portion of the "Explanation Of Rights" form he was asked to sign by police before questioning began. Therefore, he contends, that statement should have been suppressed, as it was taken in violation of his right to counsel.

■ In reviewing the denial of a motion to suppress, we may consider only the facts produced " 'at the suppression hearing ... which are most favorable to the State as the prevailing party on the motion.' " *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239 (1990) (quoting *Simpler v. State*, 318 Md. 311, 312, 568 A.2d 22 (1990)) (citations omitted). Moreover, if there is conflicting evidence, we must adopt the findings of fact of the trial judge, unless the findings are clearly erroneous. *See Riddick*, 319 Md. at 183, 571 A.2d 1239. Nonetheless, we are required to "make our own independent constitutional appraisal" as to whether an action was proper "by reviewing the law and applying it to the facts of the case." *Matthews v. State*, 106 Md.App. 725, 732, 666 A.2d 912 (1995). With this in mind, we shall now consider the circumstances surrounding appellant's statement.

Appellant turned himself in to the police on February 20, 1998. On February 21, 1998, at approximately 2:00 a.m., appellant gave a recorded statement to the police in which he placed himself at the scene of the crime but denied any involvement with the crimes alleged.

Shortly before recording appellant's statement, Detective Wayne Jones gave appellant an "Explanation of Rights Form 69." He instructed appellant to read each advisement of right aloud, then to indicate whether he understood each one by writing "yes" or "no" at the end of each advisement, and to

place his initials next to his response. After writing "yes" after each advisement and initialing each response, appellant signed his name on the signature line beneath the capitalized statement: "I HAVE READ THE ABOVE EXPLANATION OF MY RIGHTS, AND I FULLY UNDERSTAND IT." Next to his signature he wrote "yes."

> Below that appeared the following single spaced statement: I am willing to answer questions, and I do not want any attorney at this time. My decision to answer questions without having an attorney present is free and voluntary on my part.

Detective Jones instructed appellant, "If you understood what you have read, just simply place your signature." Appellant signed as instructed and placed his initials next to his signature but, next to his initials, wrote the word "no." Writing the word "no," Jones stated, "was a contradiction of [his] instructions to him."

After approximately twenty-five minutes of questioning about "the events under investigation" (to employ the State's characterization of the ensuing discussions), Detective Jones asked appellant's permission to make an audio tape of appellant's statement. Appellant consented. At the beginning of the taped statement, Detective Jones again advised appellant of his rights. He then asked appellant, for the first time, why he had written "no" after he signed the waiver of counsel provision. Appellant responded, "I put 'no' 'cause I don't like the way it's going." The detective then asked, "What's the problem?" Appellant replied, "What's the problem? What you're doing, you're trying to trick me but I ain't stupid." Pressed further by Jones, appellant explained, "What I'm indicating to you is it's either you're going to work with me or I'm not going to work with you." [3]

---

**3.** The actual exchange between Detective Jones and appellant was as follows:

Jones: Okay. Did you indicate that you understood that?
Billups: Yes sir.
Jones: And how did you do that?

During that questioning, as he had done during the pre-tape interview, appellant admitted having been in the apartment during the robbery, but he claimed that he was at the door of the apartment to buy "weed" from Barrett when he was approached by two individuals and forced into the apartment. During the recording of his statement, appellant indicated that his statement was voluntary. Later, following a hearing on appellant's motion to suppress that statement, the trial court denied the motion to suppress, holding that appellant had knowingly and voluntarily waived his right to counsel.

Neither party disputes that appellant, having surrendered pursuant to a warrant for his arrest, was the subject of a custodial interrogation at the time he gave the statement in question, and that, therefore, *Miranda* warnings were required. *See Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Nor does either party question whether the warnings were in fact given as required by law. Indeed, the only issue before us is whether appellant, by writing "no" after his signature, on a form waiving his right to counsel, asserted his right to counsel. *See Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

---

Billups: With my signature.
Jones: And did you put "yes" behind it indicating that you understood what you read?
Billups: Inaudible
Jones: Okay. Will you put "yes" there now indicating that you understand it?
Billups: I put "no" 'cause I don't like the way it's going.
Jones: What's the problem?
Billups: What's the problem? What you're doing, you're trying to trick me but I ain't stupid.
Jones: Okay, so what are you indicating to me Mr. Billups?
Billups: What I'm indicating to you is it's either you're going to work with me or I'm not going to work with you.
Jones: Okay.
Billups: I need you to work with me. I mean I can give you all of my resources and my solutions but if you not gong to work with me than [sic] what am I going to work with you if I know in the long run you still going to be playing with me to go to jail for nothing.

The test to determine whether an invocation of a right to counsel has occurred following *Miranda* warnings " 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' " *Id.* (quoting *McNeil v. Wisconsin,* 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)). The statement must be sufficiently clear "that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* But "[d]oubts must be resolved in favor of protecting the constitutional claim," and courts are to "give a broad, rather than a narrow, interpretation to a defendant's request for counsel...." *Michigan v. Jackson,* 475 U.S. 625, 633, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). Once such an assertion is made by a suspect, law enforcement officials must cease all questioning until an attorney has been made available or the suspect himself reinitiates conversation. *See Davis,* 512 U.S. at 458, 114 S.Ct. 2350 (citing *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)).

As noted earlier, before questioning began, appellant was presented with a single-page form. At the top of that document were the words "EXPLANATION OF RIGHTS." These words were capitalized, in bold print, and much larger than most of the print that followed. As no other titles appear on the page, the form seems at first blush to be a statement of rights and nothing more. Moreover, the words "Explanation of Rights Form 69" appear in the upper left-hand corner of the document. And, indeed, below this title, as promised, double-spaced and numbered, the *Miranda* advisements are laid out. After each advisement, a space is provided for the recipient to indicate, by writing "yes" and by inserting his initials, that he has been advised of that right. Below that is the statement, in capitalized letters, "I HAVE READ THE ABOVE EXPLANATION OF MY RIGHTS, AND I FULLY UNDERSTAND IT," followed by a signature line.

After reading each of the numbered warnings out loud as requested by Detective Jones, appellant wrote "yes" in the space provided at the end of the warning and initialed it. He

then signed his name on the signature line and, next to his signature, wrote "yes," indicating that his rights had been explained to him and that he understood them.

■ Below that, however, in smaller type and single-spaced, are two sentences and a signature line that, without warning, expanded this simple explanation of rights form into a waiver of counsel form. Gone are the titles, capitalized letters, bold print, enlarged lettering and double spacing, which earlier proclaimed that this was an explanation of rights form. Instead, with no title or prefatory language to indicate that a significant change in the nature of the document had occurred, the following statement appears:

> I'm willing to answer questions, and I do not want any attorney at this time. My decision to answer questions without having an attorney present is free and voluntary on my part.

There was no indication in the form that appellant had the right to decline to sign his name below this statement. Nor was it unreasonable for appellant to assume that he was signing his name, just as he had done earlier in the form, to indicate only that he understood the meaning of the preceding language. And, indeed, that was precisely the reason he was given by Detective Jones for signing there—a glaring piece of misdirection if there ever was one. Moreover, the import of this unhighlighted language, for the reasons outlined above, is easy to miss.

But appellant apparently did not miss its meaning. After complying with Detective Jones's instruction that he sign the signature line if he understood what he had read, appellant wrote "no" next to his signature. Unlike the explanation of rights portion of the form immediately preceding this waiver, no space was provided for any response but a positive one— his signature—to the waiver of counsel statement. Appellant expressed his disagreement with the waiver of counsel statement in the only way he could in the context of the form he

had been told to sign—by writing "no" beside his signature.[4]

Although the meaning of "is" has been recently debated in extrajudicial circles, we can emphatically state (much to the relief of the bar and public, we're sure) that "no" means "no." There cannot be a more unambiguous response to a written waiver than a written, unconditional "no." Indeed, it constituted an unambiguous assertion by appellant that he did not wish to answer questions without an attorney present.[5] Questioning should have stopped and not resumed until either an attorney had been made available to appellant or he had reinitiated discussions. *See Davis,* 512 U.S. at 458, 114 S.Ct. 2350.

The State contends that appellant's written "no" was ambiguous because the waiver provision was "multifaceted." We disagree. As there was no room in the provision for appellant to respond to each of its assertions, appellant had no choice but to place his written "no" where he did. That "no" can only reasonably be read as a negative response to each assertion of that provision waiving his right to counsel. Moreover, if there is any ambiguity in appellant's unequivocal and emphatic response, as contended by the State (and we do not believe that there is) because of the "multifaceted" nature of the sentences that compose the waiver of counsel provision, the ambiguity should arguably be interpreted against the

---

4. Interestingly, had appellant simply refused to sign the waiver statement to indicate his disagreement, that act might not have been sufficient to constitute a request for counsel. *See, e.g., Mincey v. Head,* 206 F.3d 1106, 1132 (2000); *United States v. Boon San Chong,* 829 F.2d 1572, 1574 (11th Cir.1987); *United States v. McDaniel,* 463 F.2d 129, 135 (5th Cir.1972).

5. In contrast, there is substantial case law indicating that a request for counsel may be disregarded as "equivocal" when preceded by words such as "maybe." *See, e.g., Davis,* 512 U.S. at 462, 114 S.Ct. 2350 (holding "[m]aybe I should talk to a lawyer" to be equivocal); *Robtoy v. Kincheloe,* 871 F.2d 1478, 1479 (holding "maybe I should call my attorney" to be equivocal); *see also Flamer v. Delaware,* 68 F.3d 710, 725 (3d Cir.1995) (holding a request to make a phone call "to inquire about ... possible representation" to be equivocal); *Ledbetter v. Edwards,* 35 F.3d 1062, 1069 (6th Cir.1994) (holding " '[i]t would be nice' to have an attorney" to be equivocal).

author of that provision—the State. No discernable public interest is served by interpreting a purportedly ambiguous waiver of rights provision in favor of the party who, either intentionally or unintentionally, inserted the ambiguity in the provision in the first place.

Finally, the State's suggestion that appellant's post-statement explanations for writing "no" next to his signature rendered ambiguous this handwritten declaration is also without merit. In rejecting a similar claim in *Smith v. Illinois,* 469 U.S. 91, 92, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984), the United States Supreme Court held that "an accused's post-request responses may not be used to cast doubt on the clarity of his initial request for counsel." *See also Brown v. State,* 79 Md.App. 163, 168, 556 A.2d 285 (1989) ("Once a defendant requests a lawyer, subsequent advisement of constitutional rights followed by acquiescence in police-initiated questioning cannot establish a valid waiver of the Sixth Amendment right to assistance of counsel.").

In *Smith,* the defendant, in response to a question by police as to whether he understood his right to have counsel present, stated, "Uh, yeah. I'd like to do that." 469 U.S. at 93, 105 S.Ct. 490. Notwithstanding this explicit request for counsel, conditioned only, if at all, by "uh" and "yeah," the state court below held that, when the statement was considered with others made later, the statement was not a clear and unequivocal invocation of the right to counsel. *Id.* at 94, 105 S.Ct. 490. Rejecting "this line of analysis" as "unprecedented and untenable," the Supreme Court stated:

Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease. In these circumstances, an accused's subsequent statements are relevant only to the question whether the accused waived the right he had invoked.

*Id.* at 98, 105 S.Ct. 490.

As the post-request statements in question were made by appellant not only after he had invoked his right to counsel

but also after he had in fact given a statement (that was audio taped twenty-five minutes later), they could not constitute a valid waiver of the right to counsel, which, to be effective, must precede the statement given. *See id.* Parenthetically, we note that at least one of appellant's post-request statements—his assertion that the police were trying to trick him— was not only unambiguous but quite understandable. Indeed, what other conclusion could he have drawn from what must have appeared to him as a deliberate effort by the police to slip in a waiver of counsel provision in an explanation of rights form and from Detective Jones's instruction that he sign the waiver of counsel statement if he simply understood it.

In sum, we hold that, because appellant invoked his right to counsel, Detective Jones should have immediately ceased his questioning of appellant. His failure to do so renders all of appellant's subsequent statements to him, taped or otherwise, inadmissible as violative of his right to counsel. The trial court therefore erred in denying appellant's motion to suppress those statements.

Because we hold that the statement in question should have been suppressed, we need not address appellant's separate contention that Detective Jones improperly induced him to make that statement. We shall, however, address such issues as remain and are properly before us for the guidance of the trial court in the event of a retrial.

## II

■ Appellant contends that the trial court erred in admitting into evidence as excited utterances the out-of-court statements of Cecil Barrett, the murder victim, to Officer Allen Dorsey, Agent Richard Hardick, and Detective Ronald Copeland. In those statements, Barrett identified appellant as his assailant and described how and where the crime took place. Because appellant failed to object at trial to Detective Copeland's testimony regarding the statements made to him by Barrett and because appellant's counsel was responsible for eliciting on cross-examination the testimony of Officer Dorsey

on this point, appellant has failed to preserve the former for our review and waived the latter. Moreover, his failure to object timely to such testimony also extends to a portion of Agent Hardick's testimony. Appellant did not object to Agent Hardick's testimony that Barrett had stated several times to him: "Kevin did it." Appellant has therefore also waived his right to challenge that portion of Hardick's testimony on appeal. Indeed, the only issue left for our consideration is whether Barrett's statement to Hardick regarding the events leading up to the offenses in question was admissible under the excited utterance exception to the rule against hearsay. Hardick described Barrett's statement as follows:

> I asked him what had happened. He said he was in his apartment when he heard a knock at the door. When he answered the door, he was confronted by two suspects. One of them, he said, was Kevin who lived next door and he couldn't describe to me the second suspect at all. He said they demanded money and Kevin pulled out or produced a nine millimeter Glock handgun.

■ The excited utterance exception is contained in Maryland Rule 5–803(b)(2). That rule provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress or excitement caused by the event or condition" is admissible as an exception to the hearsay rule. In other words, such a statement is admissible if it " 'was made at such a time and under such circumstances that the exciting influence of the occurrence clearly produced a spontaneous and instinctive reaction on the part of the declarant ... [who is] still emotionally engulfed by the situation....' *Deloso v. State*, 37 Md.App. 101, 106, 376 A.2d 873 (1977) (citations omitted)." *State v. Harrell*, 348 Md. 69, 77, 702 A.2d 723 (1997) (quoting *Harmony v. State*, 88 Md.App. 306, 319, 594 A.2d 1182 (1991)).

■ The robbery and shooting of Barrett was unquestionably a "startling event" for Barrett, *see, e.g., Johnson v. State*, 63 Md.App. 485, 492 A.2d 1343 (1985) (holding the statement of a victim of a robbery and assault, made shortly after the

crime, to be an excited utterance); and Barrett's statement, describing the entry by the two intruders into his apartment, and their demand for money, clearly related to that event. Therefore, the only issue that remains is whether Barrett's statement was "made while [he] was under the stress or excitement caused by the event...." Md. Rule 5–803(b)(2). There is considerable evidence that it was.

Agent Hardick spoke to Barrett within ten minutes of the shooting. At that time, according to Hardick's uncontradicted testimony, Barrett was scared and nervous. Indeed, on a scale of one to ten, Hardick testified, Barrett's level of excitement was a "seven or eight." As his condition worsened, according to Hardick, Barrett grew even more frantic and scared. His excitement, Hardick stated, only began to subside when he started to fade in and out of consciousness. No evidence was ever offered by appellant to contradict this testimony. The trial court thus properly concluded that appellant was under the "stress or excitement of the event" when he uttered the words at issue.

 Moreover, the only argument appellant advances in support of his claim that Barrett's statement was not an excited utterance is that the statement was given in response to a question. That fact is relevant but hardly dispositive of this issue. *See Harrell,* 348 Md. at 77, 702 A.2d 723 (citing *Mouzone v. State,* 294 Md. 692, 699, 452 A.2d 661 (1982), *overruled on other grounds by Nance v. State,* 331 Md. 549, 629 A.2d 633 (1993)); *Johnson v. State,* 63 Md.App. 485, 494–95, 492 A.2d 1343 (1985) (holding that a robbery and assault victim's statement that she was on the second floor of her home when two men came in, knocked her to the floor, kicked her several times, and stole two dollars was admissible as an excited utterance even though given in response to a police officer's question); *Long v. State,* 3 Md.App. 638, 640–41, 240 A.2d 620 (1968) (holding that a shooting victim's statement that he had been in an argument with his son and that his son had shot him was admissible even though given in response to a police officer's question two hours after the shooting). We

therefore conclude that Barrett's statement to Hardick was admissible as an "excited utterance."

## III

Finally, appellant contends that the trial court erred in imposing separate sentences on appellant for use of a handgun in connection with the murder and the armed robbery of the same victim. We agree.

In *Johnson v. State,* this Court held that "use of a single handgun against a single victim in a single transaction does not permit the imposition of *consecutive* handgun sentences." 56 Md.App. 205, 219, 467 A.2d 544 (1983) (emphasis added). In that case, we based our holding on the Rule of Lenity, the operation of which Judge Moylan described in *Walker v. State,* 53 Md.App. 171, 452 A.2d 1234 (1982):

> If the Legislature intended two crimes arising out of a single act to be punished separately, we defer to that legislated choice. *Gore v. United States,* 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958); *Bremer v. State,* 18 Md.App. 291, 343–345, 307 A.2d 503 (1973). If the Legislature intended but a single punishment, we defer to that legislated choice. If we are uncertain as to what the Legislature intended, we turn to the so-called "Rule of Lenity," by which we give the defendant the benefit of the doubt. *Simpson v. United States,* 435 U.S. 6, 13–16, 98 S.Ct. 909, 913, 55 L.Ed.2d 70 (1978); *United States v. Gaddis,* 424 U.S. 544, 547–548, 96 S.Ct. 1023, 47 L.Ed.2d 222 (1976); *Ladner v. United States,* 358 U.S. 169, 173–178, 79 S.Ct. 209, 211–14, 3 L.Ed.2d 199 (1958); *Prince v. United States,* 352 U.S. 322, 327, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957); *Bell v. United States,* 349 U.S. 81, 83–84, 75 S.Ct. 620, 99 L.Ed. 905 (1955).

*Id.* at 201, 452 A.2d 1234.

In *Johnson,* we applied the Rule of Lenity because the legislature had not clearly expressed an intent to allow for multiple punishments when two consecutive sentences were imposed for the use of a handgun against a single victim in a

single transaction. *See* 56 Md.App. at 218–19, 467 A.2d 544. The robbery and murder of Cecil Barrett involved a single victim and a single transaction. The question we must decide is whether the handgun sentences are consecutive for purposes of the Rule of Lenity when the handgun sentences are concurrent with the sentences for their underlying convictions, but the sentences for the underlying convictions are consecutive to each other.

 Appellant received a twenty-year sentence for armed robbery and a concurrent twenty-year sentence for use of a handgun in the commission of that robbery. Appellant also received a thirty-year sentence for murder and a concurrent twenty-year sentence for use of a handgun in the commission of that murder. Because appellant's murder sentence runs consecutively to his armed robbery sentence, his sentences on the related handgun offenses also run consecutively to each other and, therefore, violate the Rule of Lenity. Accordingly, the trial court should have sentenced appellant on only one of the two handgun offenses to avoid the imposition of consecutive sentences for "the use of a single handgun against a single victim in a single transaction." *See id.*

**JUDGMENT VACATED.**

**CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.**