**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

GREGORY JOHNSON, a/k/a Little Greg,
*Defendant-Appellant.*

No. 03-4677

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

GREGORY JOHNSON, a/k/a Little Greg,
*Defendant-Appellant.*

No. 03-4849

Appeals from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CR-02-178-PJM)

Argued: October 29, 2004

Decided: March 8, 2005

Before WIDENER and MOTZ, Circuit Judges, and
Glen E. CONRAD, United States District Judge for the
Western District of Virginia, sitting by designation.

---

Affirmed in part, vacated in part, and remanded by published opinion.
Judge Motz wrote the opinion, in which Judge Widener and Judge
Conrad joined.

---

**COUNSEL**

**ARGUED:** Timothy Joseph Sullivan, SULLIVAN & SULLIVAN, College Park, Maryland, for Appellant. Deborah A. Johnston, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Thomas M. DiBiagio, United States Attorney, Baltimore, Maryland, for Appellee.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

After a jury convicted Gregory Anthony Johnson of kidnaping, twice using a firearm in the commission of a crime of violence, and attempting to kill a potential witness, the district court sentenced him to imprisonment and ordered him to pay restitution to the victim and to Family & Child Services, a mental health agency that provided counseling to the victim at a reduced rate. Johnson appeals, arguing the district court erred in denying his motion to suppress statements he made to the police after he had invoked his Fifth Amendment right to counsel. He also challenges the validity of the restitution order, faulting the Government for missing a statutory deadline and arguing that third parties, like Family & Child Services, are not eligible for restitution under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A (2000). Further, after the Supreme Court decided *Blakely v. Washington*, 124 S. Ct. 2531 (2004), Johnson filed a supplemental brief challenging the constitutionality of his sentence, which was based on facts not found by the jury. We find no reversible error with the suppression or restitution orders, but we vacate his sentence and remand for resentencing in accord with *United States v. Booker*, 125 S.Ct. 738 (2005).

I.

The Government introduced evidence at trial that in the early morning of February 8, 2002, Johnson, Michael Watkins, and Alexander Martin attempted to rob Anthony Raymond, Akil Asson, and

Ihsan Muhammad. Watkins died before Johnson's trial, but Martin cooperated with the Government and pled guilty to kidnaping and using a firearm during the kidnaping. At Johnson's trial, Martin, Ms. Muhammad, and Sesame Sorrells, an eyewitness who knew Johnson prior to the crimes, provided detailed testimony as to Johnson's role in the crimes.

As the victims walked through a parking lot from a 7-Eleven to a nearby apartment complex in Chillum, Maryland, the assailants, displaying guns, ordered them to lie on the ground and searched the men's pockets and Ms. Muhammad's purse. One of the assailants kicked Mr. Raymond in the face and shot at him, although the bullet did not hit him. As the assailants were leaving, one of them said, "I think we ought to take this one with us," referring to Ms. Muhammad. The man pushed her into a waiting white car driven by a fourth man, seating her between himself and another man, while the third assailant sat in the front passenger seat. The men drove Ms. Muhammad to Washington, D.C., en route threatening to kill her, trying to sexually assault her, and slapping and punching her to stop her from praying out loud.

Ms. Muhammad escaped from the moving vehicle and ran a few feet but fell to the ground because the men had pulled her pants down to her ankles as she had tried to climb over one of them to get out of the car. The car stopped, and as Ms. Muhammad lay on the ground, Johnson approached her and repeatedly stuck his fingers in her vagina. Before the car drove off, Johnson shot Ms. Muhammad three times. She sustained serious injuries. When Martin asked Johnson why he shot Ms. Muhammad, Johnson indicated that he did so because she had heard his name.

The jury convicted Johnson of kidnaping, in violation of 18 U.S.C. § 1201(a)(1) (2000), two counts of use of a firearm in the commission of a crime of violence, in violation of 18 U.S.C. § 924(c)(2000), and one count of attempting to kill a potential witness, in violation of 18 U.S.C. § 1512(a)(1)(c)(2000).[1] Applying the United States Sentencing Guidelines, the district court sentenced him to 789 months imprison-

---

[1]The jury acquitted Johnson of two counts pertaining to the assault on Mr. Raymond.

ment to be followed by a five year period of supervised release. The court subsequently ordered Johnson to pay $495 to Ms. Muhammad and $5,240 to Family & Child Services.

On appeal, Johnson challenges the denial of his motion to suppress, the restitution order, and his sentence. We consider each contention in turn.

## II.

Johnson alleges that the district court committed reversible error by failing to suppress two written statements he gave to Prince George's County Police officers and an FBI agent.

## A.

Upon learning on February 28, 2002, that a warrant for his arrest had been issued, Johnson turned himself in to the Prince George's County Police Department. The police promptly arrested Johnson and placed him in an interview room, where they put a stationary handcuff on him. After asking him for biographical information, Detective Sherry Prince, accompanied by FBI Agent Jansen Jordan, gave Johnson the Prince George's County standard advice of rights and waiver form.

Detective Prince then read aloud the form, which states:

> I am now going to read to you your rights under the law. If you do not understand something that I say to you, please stop me, and I will explain it to you.
>
> 1. You have the right to remain silent. If you choose to give up this right, anything that you say can be used against you in court.
>
> 2. You have the right to talk to a lawyer before you are asked any questions and to have a lawyer with you while you are being questioned.

3.  If you want a lawyer, but cannot afford one, a lawyer will be provided to you at no cost.

4.  If you want to answer questions now without a lawyer, you still have the right to stop answering questions at any time.

Detective Prince handed Johnson a pen so that he could check "yes" or "no" to the four questions on the form and initial his answers. The four questions are:

Do you understand these rights?

Do you want to make a statement at this time without a lawyer?

Have you been promised anything, have you been offered any kind of reward or benefit, or have you been threatened in any way in order to get you to make a statement?

Are you under the influence of drugs or alcohol at this time?

At 12:10 p.m. Johnson initialed and checked "yes" to the first question, but initialed and checked "no" to the other three questions, and signed the form; he did not respond orally to the questions. Understanding Johnson's written answers as an invocation of his rights, Detective Prince and Agent Jordan did not ask him any further questions. They took a few photographs of Johnson and left the interview room.

When Detective Prince returned to her desk, Detective Reginald Fenner asked whether Johnson had waived his rights. Detective Prince showed Detective Fenner the waiver form, and told him that Johnson had "checked no" on the form. Detective Fenner asked Detective Prince if Johnson had "waive[d]" his right to counsel, and Detective Prince replied "no." Detective Fenner then asked if Johnson had asked for an attorney, and Detective Prince said he had not. Detective Fenner told Detective Prince that he would explain the form to Johnson and entered the interview room at approximately 12:50

p.m., which was forty minutes after Johnson had checked "no," initialed, and signed the waiver form.

Detective Fenner spoke with Johnson alone in the interview room for an hour. By his own account, Detective Fenner gave Johnson a "one-way lecture" describing police investigative tactics. But Detective Fenner did not limit his lecture to generalities. At the suppression hearing, Detective Fenner testified that he told Johnson:

> that he was here for a reason. Either somebody identified him or there was some evidence that apparently put him, his individual person here, and I explained to him that could be for any, any reasons. It could be for innocent reasons.
>
> Maybe he was walking by. Maybe somebody knew him and saw him in the area. Maybe somebody has something against him and they are lying. That if he could tell me, you know, anything that would prove that he wasn't involved or he was somewhere else, for example, like work or out of town, something I could verify, then that would help his situation.
>
> But I was honest with him. I explained to him that, you know, if he wants to tell me I was there, he was there and he did it, then I'm also, you know, willing to take that. I always give both sides of the scenario.

After the hour-long lecture, Detective Fenner took Johnson to the bathroom and when Johnson returned to the interview room, Detective Fenner gave him a cigarette and a cup of water and left him uncuffed. Detective Fenner then gave Johnson a fresh copy of the waiver form, reading through each of the rights and asking Johnson to answer the four questions. At 2:15 p.m., a little more than two hours after declining to waive his rights on the first waiver form, Johnson checked "yes" next to the question "Do you want to make a statement at this time without a lawyer?"

Over the next several hours, Johnson gave two written statements to Detective Prince and Agent Jordan. In the statements, Johnson said

that he had been drinking beer and smoking weed with his friend Turk (Alexander Martin) and a guy named T, who drove a white car. Johnson told them that he needed some money, so they drove up to two men and a woman. According to Johnson, he pointed a BB gun at them and told them to get down. Johnson and Turk patted them down while T pointed a gun at the victims. Finding no money, Johnson got back into the car, as did Turk, who sat in the front passenger seat. T placed the woman in the car and said "this bitch is coming with us." Once T and the woman were in the car, Johnson drove off. As they drove away, T fired two shots out of the car. According to Johnson, he got out of the car near his home, threw the BB gun into a dumpster, and went home. He denied shooting Mr. Raymond or hitting, sexually assaulting, or shooting Ms. Muhammad.

Prior to trial, Johnson moved to suppress his statements, arguing that Detective Fenner violated *Miranda v. Arizona*, 384 U.S. 436 (1966), by initiating further questioning after he had asserted the right to counsel and by not scrupulously honoring his right to remain silent. The district court conducted an evidentiary hearing and ruled from the bench.

The court initially made the factual finding that Johnson, "at the time of his first statement[,] was asserting a right to remain silent without a lawyer present." Although the district court recognized that Johnson claimed he had invoked both his right to remain silent *and* his right to counsel by "asserting a right to remain silent without a lawyer present," the court merged the two claims and reviewed both under *Michigan v. Mosley*, 423 U.S. 96 (1975).

The court then questioned Detective Fenner's credibility, stating:

> What complicates this case, quite frankly, is I don't think that Detective Fenner has been as candid as he should have been in this case. I think he has muddied this issue by being other than particularly candid about what happened.
>
> There is no question, and I want you to hear this, detective, there is no question in the Court's mind that you went into that room to try and get the statement that [Det. Prince]

could not get. It is absolutely clear to me that that's what happened here.

Nonetheless, the court denied the motion to suppress, reasoning that "although there are aspects of the transaction, if you will, that are somewhat troubling, I don't think that contaminates the basic statement that was made. He reconsidered his refusal to answer. There is nothing in the record that suggests that he did that other than voluntarily."

## B.

We review "[t]he district court's legal conclusions underlying a suppression determination" de novo while we review its factual findings for clear error. *United States v. Sterling*, 283 F.3d 216, 218 (4th Cir. 2002). We first determine whether the district court should have suppressed Johnson's statements, and, then, if so, we ask whether the failure to do so was harmless beyond a reasonable doubt. *See United States v. Mobley*, 40 F.3d 688, 691-94 (4th Cir. 1994). Although Johnson reiterates on appeal that the police violated both his right to remain silent and his right to counsel, we need only address his contention that the police unconstitutionally initiated further questioning after he had indicated that he did not want to make a statement without a lawyer.[2]

---

[2]If Johnson had invoked only his right to remain silent and not also his right to counsel, "the admissibility of statements obtained after [he] ha[d] decided to remain silent [would] depend[ ] under *Miranda* on whether his right to cut off questioning was scrupulously honored." *Mosley*, 423 U.S. at 104 (internal quotation marks omitted). Johnson contends here, as he did below, that the police did not "scrupulously honor" his right to remain silent. The Government argues to the contrary, pointing out that Detective Prince and Agent Jordan promptly left the room after Johnson indicated on the waiver form that he did not want to make a statement and two hours elapsed between Johnson's initial declination to make a statement and his subsequent decision to do so. We note that the two hour gap is misleading because Detective Fenner initiated his attempt to get Johnson to make a statement a mere forty minutes after Johnson declined to waive his rights. However, given our resolution of this case, including our conclusion that the failure to suppress Johnson's statements was harmless, we need not decide whether the police "scrupulously honored" Johnson's right to remain silent.

1.

In *Miranda* the Supreme Court held that the police must advise a suspect of his right to counsel and, "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." 384 U.S. at 474. Several years later, in *Edwards*, the Court explained that "it is inconsistent with *Miranda* and its progeny for authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." 451 U.S. at 485. Thus, when a suspect "expresse[s] his desire to deal with the police only through counsel," the police cannot interrogate him "until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484-85.

> If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards.

*McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991).

The purpose of the rule formulated in *Edwards* is to prevent police "badgering or overreaching — explicit or subtle, deliberate or unintentional." *Smith v. Illinois*, 469 U.S. 91, 98 (1984) (internal quotation marks and citations omitted). Police officers simply cannot continue to question a suspect despite his request for counsel "in the hope that [he] might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all." *Id.* at 99 (internal quotation marks and citation omitted). Even after the suspect has spoken with counsel, "officials may not reinitiate interrogation without counsel present." *Minnick v. Mississippi*, 498 U.S. 146, 153 (1990). This prohibition applies to all officers, not just those present when the suspect invoked his right to counsel. *Arizona v. Roberson*, 486 U.S. 675, 687-88 (1988) (citation omitted).

The Supreme Court has directed that two elements be examined to determine whether the police have obtained a statement in violation

of *Edwards*' "rigid prophylactic rule." *Smith*, 469 U.S. at 95 (internal quotation marks and citation omitted). A court must "determine whether the accused actually invoked his right to counsel." *Id.* If he did, the court must determine who initiated the further discussions that yielded the eventual statement. *See id.* If an accused, after invoking his right to counsel, did not "initiate[ ] further discussions with the police" or "knowingly and intelligently waive[ ] the right he had invoked," any statement procured by the police is inadmissible at trial. *Id.*

Although the district court made no precise finding as to who initiated the subsequent discussion that led to Johnson's eventual statements, the record is clear and the Government offers no contrary argument, that Detective Fenner — not Johnson — initiated that discussion. Forty minutes after Johnson indicated that "no," he did not wish to "make a statement at this time without a lawyer," Detective Fenner decided to "talk to [Johnson] and see if he w[ould] waive his rights;" so he entered the interrogation room, introduced himself, and "lectured" Johnson for an hour before obtaining a waiver of *Miranda* rights and two written statements from Johnson. As the district court commented, Detective Fenner "went into that room to try and get the statement that [Detective Prince] could not get." Accordingly, Detective Fenner plainly "initiated" the subsequent conversation with Johnson, "of his own volition, not in response to any actions by appellant." *McFadden v. Garraghty*, 820 F.2d 654, 658 (4th Cir. 1987). Thus Johnson's statements should have been suppressed if he invoked his right to counsel.

To invoke the right to counsel, a suspect must take an action that "can reasonably be construed to be an expression of a desire for the assistance of an attorney." *McNeil*, 501 U.S. at 178. The district court found that Johnson "at the time of his first statement was asserting a right to remain silent without a lawyer present." But the court committed legal error in failing to recognize that *Edwards* and its progeny create a "bright-line rule that *all* questioning must cease" when an accused asserts his right to counsel. *Smith*, 469 U.S. at 98. If police initiate subsequent questioning, any statement by the suspect is presumed involuntary and is, accordingly, inadmissible at trial. *See id.* at 95.

The Government concedes that in *Edwards* the Supreme Court established a bright-line rule. Yet, without expressly suggesting that the district court erred in its fact-finding, the Government argues that the *Edwards* rule does not apply here because Johnson did not unambiguously invoke his right to counsel. The Government relies on *Davis v. United States*, in which the Supreme Court stated that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." 512 U.S. 452, 459 (1994). The Government apparently maintains that Johnson, like Davis, did not "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.*

The defendants in *Davis*, and the cases relying on it, voiced mere equivocal requests for counsel, such as, "Maybe I should talk to a lawyer," *id.* at 462; "I might want to talk to an attorney," *United States v. Zamora*, 222 F.3d 756, 765-66 (10th Cir. 2000); "I think I need a lawyer," *Burket v. Angelone*, 208 F.3d 172, 198 (4th Cir. 2000); "Do you think I need an attorney here?," *Mueller v. Angelone*, 181 F.3d 557, 573-74 (4th Cir. 1999); I "might want to get a lawyer then, huh?," *United States v. Posada-Rios*, 158 F.3d 832, 867 (5th Cir. 1998); "I think I want a lawyer," "Do you think I need a lawyer?," *Diaz v. Senkowski*, 76 F.3d 61, 63-65 (2d Cir. 1996); "I can't afford a lawyer but is there anyway I can get one," *Lord v. Duckworth*, 29 F.3d 1216, 1219-21 (7th Cir. 1994).

In contrast, Johnson did not equivocate. Rather he unequivocally indicated in writing that he did not "want to make a statement at this time without a lawyer." This statement was more *un*equivocal than those statements that courts have found do trigger *Edwards*' bright-line rule. *See, e.g.*, *Smith*, 469 U.S. at 93, 99-100 (finding *Edwards* triggered where defendant responded to whether he understood that he had a right to counsel, "Uh, yeah. I'd like to do that."); *Abela v. Martin*, 380 F.3d 915, 919, 926-27 (6th Cir. 2004) (finding defendant invoked his right to counsel by stating, "[M]aybe I should speak with an attorney by the name of William Evans" and proffering Evans' business card); *Alvarez v. Gomez*, 185 F.3d 995, 998 (9th Cir. 1999)

(finding defendant's three questions, "Can I get an attorney right now, man?," "You can have attorney right now?," and "Well, like right now you got one?" constituted "an unequivocal request for an attorney"); *Kyger v. Carlton*, 146 F.3d 374, 376, 379 (6th Cir. 1998) (finding statement "I'd just as soon have an attorney [']cause, you know — ya'll say there's been a shooting involved and that's a serious charge" in response to "[W]ould you answer some of our questions, without an attorney present?" constituted an invocation of the right to counsel) (first alteration in original).

Furthermore, we are unpersuaded by the Government's implicit assertion that by checking and initialing "no" on the waiver of rights form, Johnson failed to make a clear unequivocal request for counsel because the government form itself was unclear. This argument boils down to a contention that because the question on the form, which the Government itself formulated — "Do you want to make a statement at this time without a lawyer?" — encompasses both the right to remain silent and the right to counsel, the officers could not ascertain from a simple "no" which right Johnson invoked. Such an argument is meritless. Indeed, more than four years ago, the Government expressly so conceded.

In *Tindle v. United States*, 778 A.2d 1077 (D.C. 2001), the defendant checked "no" to precisely the same question — "Do you want to make a statement at this time without a lawyer" — on precisely the same Prince George's County Waiver of Rights form. *Id.* at 1080. The defendant in *Tindle* then moved, as Johnson did, to suppress subsequent statements made at police initiation. The trial court, like the district court here, denied the suppression motion. In *Tindle*, however, the United States "candidly concede[d] that the trial court erred by failing to suppress" the defendant's statement "under *Miranda/Edwards*." *Id.* at 1078. The D.C. Court of Appeals agreed, explaining that any effort to persuade a suspect to make a statement after he has indicated on this waiver form that he does not "want to make a statement at this time without a lawyer" violates *Edwards*. *Id.* at 1083.[3]

---

[3]Thus, the Prince George's County police officers have been on notice for some time that a suspect invokes his right to counsel by doing exactly what Johnson did here. Moreover, we note that in this case not only did

This may be why the Government does not press this argument in the case at hand.

In any event, we must reject it. Any ambiguity as to whether Johnson checked "no" on the form because he wanted to remain silent or because he wanted an attorney would be due entirely to the limited content and wording of the waiver form itself. In fact, the prosecutor admitted during the suppression hearing that the question — "Do you want to make a statement at this time without a lawyer?" — "blends your right to remain silent and your right to an attorney into one question." Unlike other waiver of rights forms routinely used by law enforcement authorities, *see, e.g., United States v. Brown*, 287 F.3d 965, 970 n.2 (10th Cir. 2002), the form at issue here neither gave Johnson the option of explicitly requesting an attorney nor the option of simply stating he did not want to make a statement at this time. As a Maryland court recently explained in similar circumstances:

> [i]f there is any ambiguity in appellant's unequivocal and emphatic response, as contended by the State (and we do not believe that there is) because of the "multifaceted" nature of the sentences that compose the waiver of counsel provision, the ambiguity should arguably be interpreted against the author of that provision — the State. No discernable public interest is served by interpreting a purportedly ambiguous waiver of rights provision in favor of the party who, either intentionally or unintentionally, inserted the ambiguity in the provision in the first place.

*Billups v. State*, 762 A.2d 609, 615-16 (Md. Ct. Spec. App. 2000).

---

the district court conclude that Johnson had invoked his right to counsel by checking the form, but both FBI Agent Jordan and Detective Prince, albeit reluctantly, testified that they too had so concluded. Thus, Agent Jordan acknowledged that the "last thing [he] heard [from Johnson before he and Detective Prince left the room] was I want a lawyer." Similarly, Detective Prince testified that, when Johnson checked "no" on the form, she knew that "he did not want to make a statement at this time without a lawyer, so I left."

We, too, refuse to fault the defendant for any ambiguities — intentional or otherwise — created by the Government. The Supreme Court has stated that "[i]t is no less good morals and good law that the Government should turn square corners in dealing with the people than that the people should turn square corners in dealing with their government." *Heckler v. Community Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 61 n.13 (1984) (quoting *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229 (1961) (Black, J., dissenting)). This is especially true when dealing with the waiver of fundamental rights. "The courts must presume that a defendant did not waive his rights; the prosecution's burden is great." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). Because "we should indulge every reasonable presumption against waiver of fundamental constitutional rights," *Michigan v. Jackson*, 475 U.S. 625, 633 (1986) (internal quotation marks and citation omitted), we cannot interpret an ambiguity caused by the Government to be a waiver of the right that "is indispensable to the protection of the Fifth Amendment privilege," that is, the right to counsel. *Miranda*, 384 U.S. at 469. "Doubts must be resolved in favor of protecting the constitutional claim." *Jackson*, 475 U.S. at 633.

Therefore, we must interpret Johnson's "no" in response to the Government's question, "Do you want to make a statement at this time without a lawyer?," as an invocation of the right to counsel. After Johnson invoked his right to counsel, Detective Fenner initiated a discussion to persuade Johnson to make a statement in direct violation of *Edwards*' bright-line rule. Accordingly, the district court erred in admitting Johnson's subsequent statements.

2.

Having found the district court erred in admitting Johnson's statements, we must "review[ ] the remainder of the evidence against [him] to determine whether the admission of the confession was harmless beyond a reasonable doubt." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). We ask "whether, viewing the record as a whole, it is 'clear beyond a reasonable doubt that the jury would have returned a verdict of guilty'" absent the confession or statement. *United States v. Jones*, 913 F.2d 174, 177 (4th Cir. 1990). Although we recognize that a confession can be "the most probative and damag-

ing evidence that can be admitted against [a defendant]," *Fulminante*, 499 U.S. at 296 (internal quotation marks and citation omitted), we must conclude that the jury would have convicted Johnson even without his statements.

This case does not involve a "full confession in which the defendant discloses the motive for and means of the crime," which "may tempt the jury to rely upon that evidence alone in reaching its decision." *Id.* Rather it involves statements concerning only "isolated aspects of the crime." *Id.* Moreover, in these statements, Johnson minimized his participation in the crime. He admitted that he attempted to rob Ms. Muhammad, Mr. Raymond, and Mr. Asson and that he was present when Ms. Muhammad was abducted. But he insisted that he only threatened the victims with a BB gun and claimed that he went home before Ms. Muhammad was taken to Washington, D.C., sexually assaulted, and near-fatally shot. Thus Johnson's statements provided evidence only that he had been one of the men in the parking lot with Martin initiating the chain of events that ended in Ms. Muhammad's shooting.

The Government, however, introduced an abundance of other evidence, including eye-witness testimony, placing Johnson in the parking lot with Martin robbing the victims — and attempting to rob others. For example, Sesame Sorrells, who knew Johnson before the crime, identified Johnson from a photo array, and testified at trial that Johnson was among the armed assailants in the parking lot the evening in question. And Martin, Johnson's co-defendant, whom all of the victims identified from a photo array, testified that he and Johnson, and two other men, committed the robbery and abducted Ms. Muhammad. Thus, the Government offered ample and uncontroverted evidence proving the only damaging facts revealed by Johnson in his statements. *See Mobley*, 40 F.3d at 694 (finding improper admission of defendant's statement identifying gun was harmless because government presented other evidence establishing the gun belonged to defendant).

Furthermore, the Government proved Johnson's involvement in the sexual assault and shooting of Muhammad without *any* use of his statements. All of the evidence pertaining to Ms. Muhammad's actual sexual assault and shooting came from the testimony of Ms. Muham-

mad and Martin; Johnson never confessed to those crimes. To the extent the improperly admitted evidence — that is, Johnson's statements — did not establish the conduct for which he was convicted, the error must be harmless. *See United States v. Suarez*, 263 F.3d 468, 484 (6th Cir. 2001) (finding any error in admitting defendant's statements would be harmless because the statements did not pertain to the conduct for which defendant was convicted).

For all these reasons, we conclude that the error in admitting Johnson's statements was harmless beyond a reasonable doubt. Accordingly, we affirm his conviction.

### III.

Because of the nature of Johnson's crimes, the Mandatory Victims Restitution Act (MVRA), required the district court to order Johnson to pay restitution. *See* 18 U.S.C. § 3663A(c). At the August 4, 2003, sentencing hearing, the Government had yet to determine an estimate of the amount of restitution owed, so the district court proceeded with sentencing but referred the task of setting a restitution amount to a magistrate judge. Two and a half months later, because the magistrate had not scheduled a restitution hearing, the Government asked the district court to schedule a restitution hearing before October 31, 2003, the date on which the statutory ninety-day period for ordering restitution would expire. *See* 18 U.S.C. § 3664(d)(5). At a hearing on October 29, the district court ordered Johnson to pay restitution to Ms. Muhammad and Family & Child Services.

Johnson challenges the district court's restitution order on two grounds. First, he argues that the Government forfeited its request for restitution by failing to give the court ten days' notice that the amount of the victim's losses would not be ascertainable by the sentencing hearing. Second, he contends that the court lacked authority to award restitution to Family & Child Services because the agency does not fall within the statutory definition of "victim." We reject both arguments.

### A.

Johnson maintains that the Government's request for restitution was untimely because § 3664(d)(5) provides in relevant part:

If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing.

18 U.S.C. § 3664(d)(5). Johnson contends that the district court lacked authority to postpone the restitution hearing because the Government failed to provide the court with ten days' notice prior to the sentencing hearing that the victim's losses were not ascertainable. We are unaware of any case — and Johnson cites none — considering the preclusive effect of § 3664(d)(5)'s ten-day limit. However, our sister circuits' cases on the failure to comply with § 3664(d)(5)'s ninety-day limit provide guidance on the proper disposition of Johnson's claim.

The First, Second, and Seventh Circuits have held that district courts can enter restitution orders more than ninety days after sentencing provided that the delay does not prejudice the defendant. *See, e.g.*, *United States v. Cheal*, 389 F.3d 35, 49-50 (1st Cir. 2004) (finding failure to enter restitution order within ninety days of sentencing did not constitute plain error); *United States v. Pawlinski*, 374 F.3d 536, 539 (7th Cir. 2004) (stating the time limits in § 3664(d)(5) "can sometimes be bent"); *United States v. Zakhary*, 357 F.3d 186, 191 (2d Cir. 2004) ("[A] district court's failure to determine identifiable victims' losses within ninety days after sentencing, as prescribed by § 3664(d)(5), will be deemed harmless error to the defendant unless he can show actual prejudice from the omission."). *Cf. United States v. Terlingo*, 327 F.3d 216, 217 (3d Cir. 2003) (concluding ninety-day time limit "is subject to equitable tolling when the delay is caused in significant part by the defendant"); *United States v. Dando*, 287 F.3d 1007 (10th Cir. 2002) (upholding belated restitution order); *United States v. Maung*, 267 F.3d 1113, 1122 (11th Cir. 2001) (finding district court generally must enter restitution order within ninety days but noting "we are not willing to say that the 90-day limitation is inexorable and can never be equitably tolled"); *United States v. Vandeberg*, 201 F.3d 805, 812-14 (6th Cir. 2000) (upholding restitution order even though defendant did not have an opportunity to object within ninety-day period). *But see United States v. Jolivette*, 257 F.3d 581, 584 (6th Cir. 2001) (holding, without reference to *Vandeberg*, that "when the 90-day clock runs out, the judgment of conviction and sen-

tence, including the restitution provision, becomes final by operation of statute").

In so holding, the courts have explained that the procedural requirements of § 3664 are intended to protect victims, "not the victimizers." *United States v. Grimes*, 173 F.3d 634, 639 (7th Cir. 1999). "[T]he purpose behind the statutory ninety-day limit on the determination of victims' losses is not to protect defendants from drawn-out sentencing proceedings or to establish finality; rather, it is to protect crime victims from the willful dissipation of defendants' assets." *Zakhary*, 357 F.3d at 191. Thus, these courts have reasoned that, "[a]bsent a defendant's clear showing that his substantial rights have been prejudiced by a § 3664(d)(5) delay, it would in fact, defeat the statutory purpose to allow a defendant to invoke this provision in order to avoid paying restitution to the victims of his crime." *Id.* at 192-93 (internal quotation marks and citation omitted).

Johnson offers no reason why the ten-day notification rule in § 3664(d)(5) should be enforced more strictly than the ninety-day determination requirement, and we see none. Both rules are procedural only and failure to comply with them does not provide a basis for questioning the accuracy of the restitution order. Thus, just as the failure to conform with the ninety-day limit constitutes harmless error absent prejudice, so too does the failure to comply with the ten-day limit. Johnson has failed to show any prejudice from the postponement of his restitution hearing. He had notice of the amount sought, and the court held a lengthy hearing before entering the restitution order. Accordingly, we reject this argument.

### B.

Johnson also maintains that the district court improperly ordered him to pay restitution to Family & Child Services. Johnson does not dispute that the agency provided Ms. Muhammad with necessary psychological counseling to deal with his crimes, or that the agency charged a reasonable fee for these services. However, Johnson argues that the district court could order him to pay restitution only to Ms. Muhammad for the reduced fees she paid the agency and could not order him to pay restitution to the agency for the fair cost of the treatment it provided Ms. Muhammad at its own expense.

Johnson insists that Family & Child Services is not entitled to restitution for the fair cost of the treatment provided Ms. Muhammad because it is not a "victim" as that term is defined in the statute, i.e., "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2). Generally, Congress has provided for restitution payments only to victims. *See United States v. Blake*, 81 F.3d 498, 505-06 (4th Cir. 1996) (interpreting other provisions of 18 U.S.C.A. § 3663 (West 1985 & Supp. 1995), a statutory predecessor of the present § 3663A, which provided for discretionary, rather than mandatory restitution.)

When a crime results "in bodily injury to a victim," however, the MVRA does not limit restitution for medical or psychological costs to those expenses *incurred by the victim*. 18 U.S.C. § 3663A(b)(2). Rather, the statute expressly provides that a court "shall order" the defendant to "pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including non-medical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment." § 3663A(a)(1) and (b)(2)(A).

Unlike subsection (b)(2)(C) of the same statute, which requires the defendant to "reimburse *the victim* for income lost by such victim as a result of [an offense resulting in bodily injury]," subsection (b)(2)(A) does not require reimbursement for medical expenses be made *to the victim*, but rather provides that the defendant "pay an amount equal to the cost of necessary medical . . . services." *Compare* 18 U.S.C. § 3663A(b)(2)(A) *with* § 3663A(b)(2)(C). The careful choice of words indicates a legislative intent to require those convicted of crimes resulting in bodily injury to pay the entire "amount equal to the cost of necessary medical . . . services," even when the provider of the services has not taxed the victim herself with the full amount of those costs.[4]

---

[4]Legislative history supports our estimation of congressional intent. The stated purpose of the MVRA was "to ensure that the offender realizes the damage caused by the offense and pays the debt owed to the victim *as well as to society*." S. Rep. 104-179, at 12 (1995), *reprinted in*

As the only other court to consider the question has explained, the language of § 3663A(b)(2)(A) "expresses Congress' intention that a defendant must, in every case involving bodily injury, pay what it costs to care for the victim, whether or not the victim paid for the care or was obligated to do so." *United States v. Cliatt*, 338 F.3d 1089, 1091 (9th Cir. 2003).[5] Thus, the *Cliatt* court upheld an order of restitution to a military hospital that provided treatment at no cost to a victim of violent crime. *Id.* at 1090. In doing so, the court said, "under the MVRA, a district court properly orders restitution to be paid to a third party when that party bears the cost of providing necessary medical care to a victim of a covered offense who suffered bodily injury as a result of the offense." *Id.*

In sum, the district court did not abuse its discretion in ordering Johnson to pay restitution to the agency that provided necessary psychological counseling to Ms. Muhammad.

---

1996 U.S.C.C.A.N. 924, 925 (emphasis added). Congress' intent that restitution cover the victim's medical expenses regardless of whether the victim is obligated to pay for them is further evidenced by 18 U.S.C. § 3664(j)(1), which "clarifies that if a victim receives, or is entitled to receive, compensation from some other source (including insurance proceeds), the court must order that, after the victim's losses have been fully satisfied, restitution be payed to the person providing that compensation." S. Rep. 104-179, at 15, 1996 U.S.C.C.A.N. 924, 928.

[5]*United States v. Follet*, 269 F.3d 996 (9th Cir. 2001), on which Johnson heavily relies, does not hold to the contrary or in any way assist him. Rather, it supports the result we reach here. In *Follet*, the court vacated an order requiring the defendant to pay restitution to a third-party — but the restitution order was issued pursuant to a very different statute, namely, 18 U.S.C. § 2248 (2000). That statute required the defendant to pay the victim the "full amount of the victim's losses," which it defined to include "any costs *incurred* by the victim" for enumerated expenses. 18 U.S.C. § 2248(a),(b)(1), and (b)(3) (emphasis added). The *Follet* court specifically contrasted this language with that of the statute at issue here, 18 U.S.C. § 3663A(b)(2)(A), which "permits courts to order *not* the costs incurred by the victim but 'an amount *equal to the cost of necessary . . . psychological care*.'" *Follet*, 269 F.3d at 1001 (first emphasis added). The *Follet* Court concluded that this language in § 3663A "appears clearly to allow restitution to reflect the value of services provided, no matter who is obligated to pay for them." *Id.*

IV.

After the Supreme Court decided *Blakely*, Johnson filed a supplemental brief challenging his sentence. He argues that the district court violated the Sixth Amendment by imposing a sentence that exceeded the maximum authorized by the facts found by the jury.

The jury convicted Johnson of kidnaping, using a firearm in the kidnaping, attempting to kill a witness, and using a firearm in the attempted killing. However, his sentence was based on a fifth crime for which he was not convicted — criminal sexual assault. Pursuant to Guidelines §§ 2A4.1(b)(7)(A) and 2A3.1(a) (2000), the presentence report indicated that Johnson's base offense level for kidnaping Muhammad was a 27 because the kidnaping occurred in connection with a sexual assault, a fact not found by the jury. The report recommended an enhancement of fourteen points, in part because the kidnaping involved sexual abuse and Ms. Muhammad sustained permanent or life-threatening bodily injury, facts which were not found by the jury. The presentence report calculated Johnson's combined offense level as 41. The district court summarily "adopt[ed] the factual findings and Guideline application in the presentence report."

Based on Johnson's criminal history category of I, the Guideline range for the grouped kidnaping and attempt to kill a witness counts was 324 to 405 months. The district court sentenced Johnson at the top of the range to 405 months, that is, to 33.75 years. The district court also found that the two gun counts involved separate uses of a firearm and, therefore, imposed consecutive sentences of seven years and twenty-five years on the respective § 924(c) counts, bringing Johnson's total sentence to 65.75 years.

The Government admits that Johnson's sentence exceeded that which would be available absent a finding of criminal sexual abuse. *See* Supp. Brief of Appellee at 9. Of course, because Johnson raises his Sixth Amendment challenge to his sentence for the first time on appeal, we can only vacate his sentence if the district court imposed it in plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 731-32 (1993). However, we have recently held that a district court does commit plain error, which we will recognize, when it "impos[es] a sentence exceeding the maximum authorized by the

jury findings alone." *United States v. Hughes*, ___ F.3d ___, 2005 WL 147059, at *2 (4th Cir. 2005). In this case, the district court imposed a sentence based on facts not found by the jury. Accordingly, as in *Hughes*, we notice the error, vacate the sentence, and remand for resentencing "consistent with the remedial scheme set forth in Justice Breyer's opinion for the Court in *Booker*." *Id.* (citing *Booker*, 125 S.Ct. at 756-57).

## V.

For the reasons set forth above, the judgment of the district court is

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED.*